283-08/PJG
FREEHILL HOGAN & MAHAR, LLP    *Judge McMahon*
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BG 1651)

'08 CIV 6258

RECEIVED
JUL 10 2008
U.S.D.C. S.D. N.Y.
08 CIVISHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ATLANT HEAVY LIFT CORPORATION LIMITED
and ATLANTSKA PLOVIDBA D.D.,

                                        Plaintiffs,

        - against –                                    **VERIFIED COMPLAINT**

WELLSTREAM INTERNATIONAL LTD.,
WELLSTREAM DO BRASIL INDUSTRIA E
SEVICOS LTDA. and TRINITAS MARITIME
CARRIERS B.V.,

                                        Defendants.
------------------------------------------------------------------x

        Plaintiffs Atlant Heavy Lift Corporation Limited (hereinafter "Atlant") and

Atlantska Plovidba d.d. (hereinafter "Atlantska") (collectively "Plaintiffs"), by their

attorneys Freehill Hogan & Mahar, LLP, as and for their Verified Complaint against

Defendants Wellstream International Ltd. (hereinafter "Wellstream"), Wellstream Do

Brasil Industria E Sevicos Ltda. (hereinafter "Wellstream Brasil") (collectively

"Wellstream Defendants") and Trinitas Maritime Carriers B.V. (hereinafter "Trinitas")

allege upon information and belief as follows:

        1.        This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure in that it involves tort losses and claims relating

to a fire onboard an ocean cargo vessel and the resulting damage which occurred to cargo

and the vessel as a consequence of that casualty. As such, this case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

2.    At all times material hereto, Plaintiff Atlant was and still is a foreign business entity duly organized and existing under the laws of the Marshall Islands with a business address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands.

3.    At all times material hereto, Plaintiff Atlantska was and still is a foreign business entity duly organized and existing under the laws of Croatia with a business address at Od Svetog Mihajla 1, P.O. Box 192, Dubrovnik 20000, Croatia.

4.    At all times material hereto, Defendant Wellstream was and still is a foreign business entity duly organized and existing under the laws of England with an office and place of business at Wellstream House, Wincomblee Road, Walker Riverside, Newcastle Upon Tyne, NE6 3PF, England.

5.    At all times material hereto, Defendant Wellstream Brasil was and still is a foreign business entity duly organized and existing under the laws of Brazil with an office and place of business at Av. Rio Bronco 138, 11A Andar, Rio de Janeiro, 2040-002, Brazil.

6.    At all times material hereto, Defendant Trinitas was and still is a foreign business entity duly organized and existing under the laws of The Netherlands with an office and place of business at Bergweg 151, 3707 AC Zeist, The Netherlands.

**Outline of the Position of the Parties in the Charter Chain and Underlying Facts**

7.     At all times material hereto, Plaintiff Atlant was the owner of the M/V ATLANT TRINA, an ocean-going cargo vessel, which vessel was managed by Plaintiff Atlantska.

8.     Pursuant to a maritime time charter party contract, Plaintiff Atlant, as owner, let the M/V ATLANT TRINA to Schiffahrtskontor Altes Land GmbH & Co. KG ("SAL") for purposes of the carriage of cargo in worldwide trade.

9.     SAL, in turn, sub-chartered the vessel on a time charter basis to Industrial Maritime Carriers USA Inc. ("IMC") for similar carriage of cargo.

10.     IMC, in turn, sub-chartered the vessel on a time charter basis to Defendant Trinitas for the purpose of the carriage of the cargo which forms the subject matter of this action, as appears more fully below.

11.     Prior to its entry into the above referenced time charter party with IMC, Defendant Trinitas had entered into a Contract of Affreightment on or about July 14, 2005 with Defendant Wellstream ("the COA"), which provided for a series of shipments of Wellstream cargo from North Europe to Brazil.

12.     Defendant Wellstream is a manufacturer of sub-sea pipe used in the offshore oil exploration business, which is shipped on large, metallic reels.

13.     Under the terms of the COA, Trinitas had undertaken to carry for Defendant Wellstream approximately 300 reels of coiled sub-sea pipe in a series of shipments to be performed over a three-year period.

14.    The charter of the M/V ATLANT TRINA by Trinitas from IMC, as described in Paragraph 10 above, was intended to fulfill a portion of Trinitas' obligations to Wellstream under the COA - to wit, four voyages.

15.    In August 2006, the M/V ATLANT TRINA was loaded at the port of Newcastle Upon Tyne with a cargo of Wellstream's coiled sub-sea pipe, consisting of 5 reels stowed on deck and 12 reels stowed under deck, the cargo being consigned to Defendant Wellstream Brasil under terms of a series of bills of lading issued by Defendant Trinitas for carriage to the port of Niteroi, Brazil.

16.    After loading, the vessel proceeded from Newcastle Upon Tyne to Brazil without incident, arriving on or about August 25, 2006.

17.    During discharge operations, specifically, the cutting by torch of the deck sea fittings (which had been positioned to hold the reels in place), a fire occurred which resulted in physical damage to the coiled sub-sea pipe onboard the vessel (as alleged by the Wellstream Defendants) and damages to the vessel in the form of physical loss and loss of earnings.

### As and for a First Cause of Action against the Wellstream Defendants

18.    Plaintiffs repeat and reallege each and every allegation as set forth in Paragraphs 1-17 above, with the same force and effect as if fully set forth at length herein.

19.    As a consequence of the damages allegedly suffered to the cargo of sub-sea pipe, the Wellstream Defendants commenced an action against Plaintiffs in Brazil for recovery of their losses in tort.

20.    Subsequent to the filing of the above-referenced Brazilian action, the case was transferred by agreement from the Brazilian courts to the High Court of Justice in London under terms of an agreement which provided that the merits of all claims would be heard in London applying Brazilian substantive law.

21.    In addition, and in connection with the alleged losses suffered by the Wellstream Defendants, who had caused an arrest of the vessel, security was posted on behalf of the Plaintiffs herein (in the form of a P&I Club Letter of Undertaking) securing the claims of the Wellstream Defendants in the total amount of $13 million, plus interest and costs as might be recovered.

22.    The High Court action by the Wellstream Defendants has since been commenced, and the "Particulars of Claim" (in effect the Complaint) filed by the Wellstream Defendants against the Plaintiffs herein sets forth the basis of the Wellstream Defendants' tort claims against the Plaintiffs pursuant to Brazilian law and seeks recovery of losses allegedly sustained by Wellstream which total, as best as can be currently calculated, US$21,018,549.21 including interest at 12% over 5 years. Attached hereto as **Exhibit A** is a copy of "Particulars of Claim" filed by Wellstream in the London action (including "Annexure 2" which itemizes the quantum claimed (the components of which are in a variety of currencies)). Attached hereto as **Exhibit B** is a converted US Dollar summary itemization of the amounts claimed by Wellstream totaling the aforesaid US$21,018,549.21.    In addition Wellstream, if successful on its claim against Plaintiffs, would be entitled to an award of its costs and fees in prosecuting its claims in the London action which London solicitors estimate would total approximately BPS £1,000,000 which equates to US$1,980,000 ( See Exhibit B)

23.    Plaintiffs have filed, and attach hereto as **Exhibit C**, a Defence and Counterclaim in the above-referenced High Court action, generally outlining their defense against the claims of the Wellstream Defendants and lodging a counterclaim for the damages suffered by virtue of the casualty, including physical damage to the vessel and lost revenue while the vessel was out of service undergoing repairs.

24.    As set forth in greater detail in the Defence and Counterclaim, not only do Plaintiffs assert that they have no liability for the damages asserted by the Wellstream Defendants, but pursuant to the applicable Brazilian substantive law, the Wellstream Defendants are in fact liable to the Plaintiffs for the physical damage to the vessel and lost revenue damages referred to in Paragraph 23 above.

25.    Specifically, under the terms of the COA, the Wellstream Defendants undertook the obligation to discharge the subject cargo, which included the removal of the deck sea fittings securing the reels stowed on deck during ocean transport.

26.    The Wellstream Defendants delegated that obligation to Defendant Trinitas who in turn arranged for and hired the local contractors who performed the actual removal of the deck sea fittings.

27.    The above-referenced removal of the deck sea fittings was performed in a negligent manner during which the local contractors failed to take sufficient care during the operation and/or lacked the skill to perform the operation and/or committed successive errors in the manner in which the operation was undertaken, which operation included the use of oxy-acetylene torches.

28.    In this respect, the local contractors burned a hole in the steel hatch cover causing molten metal and/or sparks to enter the vessel's hold which then ignited a

tarpaulin which had been utilized to protect the outer layer of sub-sea pipe stowed under deck, which then resulted in ignition and fire causing damage to other cargo and the vessel as aforesaid.

29.     Under the applicable substantive Brazilian law, the Wellstream Defendants are responsible in tort to the Plaintiffs for the damages suffered as a consequence of the casualty as the local contractors would, under Brazilian law, be considered the agents or servants of the Wellstream Defendants, the latter of whom owed a duty to the Plaintiffs giving rise to a claim in tort.

30.     The direct damages suffered and/or the expenses incurred or to be incurred as a consequence of this casualty to the Plaintiffs, as nearly as can be estimated, are set forth in the itemization attached to Exhibit C entitled "Appendix 3 – Claim Schedule", and are summarized (and converted to US Dollars) as follows:

(i)     The physical damages and repairs to the vessel total **US $2,587,417.79** consisting of:

(A) "Expenses at Niteroi" (Exhibit C at Appendix 3, items A 1-15): (US$263,435.35; plus Euros 21,042.33 (at US$1.57 per Euro) equals US$ 33,036.46; plus Kn 1,098 (at US$ 0.215 per Kn) equals US$236.07); for a subtotal of US$296,707.88;

(B) "Bunkering at Las Palmas" (Exhibit C at Appendix 3, item B - 16): Euros 3,469.65 (at US$1.57 per Euro) for a subtotal of US$5,447.35;

(C) "Crane repairs at Hamburg" (Exhibit C at Appendix 3, items C 17-21): (US$39,694.82; plus Euros 430,508.50 (at US$1.57 per Euro) equals US$675,898.34; plus Kn 84,639.20 (at US$ 0.215 per Kn) equals US$18,197.43); for a subtotal of US$733,790.59:

(D) "Hatch Cover repairs Gdansk": (Exhibit C at Appendix 3, items D 22-26): (US$33,391.98; plus Euros 630,080.22 (at US$1.57 per Euro) equals US$989,225.95; plus Kn 2,340 (at US$ 0.215 per Kn) equals US$503.10); for a subtotal of US$1,023,121.03;

(E) "Crane Service at Aviles' (Exhibit C at Appendix 3, items E 27 and 28): Euros 4228.37 (at US$1.57 per Euro) for a subtotal of US$6,638.54;

(F) "Delivery of Crane Spares at Venice" (Exhibit C at Appendix 3, items F 29-31); Euros 12,100.82 (at US$1.57 per Euro) for a subtotal of US$18,998.28;

(G) "Miscellaneous Owners Expenses" (Exhibit C at Appendix 3, items G 32-38) for a subtotal of US$502,714.12;

(ii) The loss of earnings ("hire") suffered during the period the vessel was out of service undergoing repairs (Exhibit C at Appendix 3, item H 39) amount to Euros 829,578.90 (at US$1.57 per Euro) for a subtotal of US **$1,302,438.87**;

(iii) Interest on the foregoing physical damages and loss of earnings, computed at the rate claimed by Wellstream in the London Complaint) for a period of 5 years (the period anticipated to complete the London proceedings) as follows: (US$2,587,417.79 + US$1,302,438.87) = US$ 3,889,856.66 x **12% x 5 years = US$ 2,333,931.99;**

(iv) The anticipated legal fees and costs incurred in connection with the defence of the Wellstream Defendants' claim and the prosecution of Plaintiffs' counterclaims in London are estimated by London solicitors to be approximately BPS £1,000,000 which converts to **US$1,980,000.00;**

for a total sum of **$US 8,203,788.65** which the Wellstream Defendants are liable to the Plaintiffs herein in tort and for which an attachment under Rule B is sought against the said Wellstream Defendants.

### As and for a First Cause of Action against Trinitas

31.    Plaintiffs repeat and reallege each and every allegation as set forth in Paragraphs 1-17 above, with the same force and effect as if fully set forth at length herein.

32.    As outlined above, subsequent to the casualty referred to herein, the Wellstream Defendants commenced an action(s) in Brazil which was subsequently re-filed in the High Court.

33.    In that ongoing High Court action commenced by the Wellstream Defendants against the Plaintiffs herein, the Plaintiffs have issued a "Part 20 Action" (which is akin to a US FRCP third-party complaint) against Defendant Trinitas, a copy of which is attached hereto as **Exhibit D**.

34.    As is outlined in greater detail in the above-referenced Part 20 Action, Plaintiffs' third party claim against Trinitas includes, *inter alia:* (a) the aforesaid damages Plaintiffs have suffered by virtue of the casualty including physical damage to the vessel and lost revenue while the vessel was out of service undergoing repairs plus interest (see amounts set forth at paragraph 30 above), plus (b) indemnity for the potential liability, interest and costs Plaintiffs face by virtue of the Wellstream Defendants' suit in the High Court for the losses and damages allegedly suffered by the latter as set forth in Paragraphs 19-22 herein.

35.    As is set forth in greater detail in the Plaintiffs' Part 20 Action, and pursuant to applicable Brazilian substantive law, Trinitas is liable to the Plaintiffs for the damages outlined in Paragraph 34 above by virtue of the fact that Trinitas accepted the delegation by the Wellstream Defendants to arrange for the discharge of the cargo (including the removal of the deck sea fittings), and directly appointed the local contractors who acted under Trinitas' instructions and who would therefore also be considered the servants and/or agents of Defendant Trinitas for purposes of liability to others, including the Plaintiffs.

36.     As outlined above, the local contractors who performed the actual removal of the deck sea fittings did so in a negligent manner during which the contractors failed to take sufficient care of the operation and/or lacked the skill to perform the operation and/or committed successive errors in the manner in which the operation was undertaken, which included the use of oxy-acetylene torches, causing the fire as described in greater detail in Paragraph 28 above.

37.     Under the applicable substantive Brazilian law, Trinitas is responsible in tort to the Plaintiffs for the damages suffered as a consequence of the casualty as the contractors would, pursuant to Brazilian law, be considered the agents or servants of Trinitas, the latter who owed a duty to the Plaintiffs giving rise to a claim in tort.

38.     The damages suffered and/or the exposure presented to the Plaintiffs as a consequence of the above referenced tort of Trinitas and the resulting casualty as nearly as can be estimated, include:

(i)     the physical damage to the vessel and lost revenue while the vessel was out of service undergoing repairs plus interest on both components (see amounts at paragraph 30 (i),(ii) and (iii) above), for a subtotal of US$6,233,788.65;

(ii)    exposure to the Wellstream Defendants for their claim of cargo loss and related damages which, as nearly as can be estimated and based upon the allegations of the Wellstream Defendants in the High Court proceedings, totals US$21,018,549.21 plus US$1,980,000.00 in costs potentially payable to Wellstream for a subtotal of US$22,998,549.21;

(iii)   costs recoverable over against Trinitas incurred in connection with defending the Wellstream Defendants' suit in the High Court and the prosecution of the counter claims, which London solicitors again estimate at approximately BPS £1,000,000 which equates to US$1,980,000.00.

for a total sum of **US$ 31,212,337.86**  which the Defendant Trinitas is liable to the Plaintiffs in tort and for which an attachment under Rule B is sought against Trinitas.

## Application for Rule B Attachment against all Defendants

39.    Upon information and belief, and after investigation, none of the Defendants can be "found" within this district for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiffs are informed and believe that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of Defendants (hereinafter, "ASSETS"), including but not limited to ASSETS, at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

40.    Under the governing law, interest, costs and legal fees will be awarded to the prevailing party and as such, should be considered as an element of the Plaintiffs' claim for purposes of an attachment.

41.    To the extent the Plaintiffs have stated maritime claims against the Defendants, and the Defendants, after investigation, cannot be found, Plaintiffs are entitled to a maritime attachment in connection with their claims as aforesaid against the Wellstream Defendants in the amount of **US$ 8,203,788.65** and against Defendant Trinitas in the amount of **US$ 31,212,337.86.**

42.    This action is commenced for the purpose of obtaining security in connection with the claims of the Plaintiffs to be prosecuted in the High Court action

referred to herein, and Plaintiffs specifically reserve their rights to adjudicate the substantive aspects of their claims in the London High Court proceedings.

**WHEREFORE**, Plaintiffs pray:

a.    That process in due form of law according to the practice of this Court issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged;

b.    That since Defendants cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendants, up to and including the sum of **US$ 8,203,788.65** of the Wellstream Defendants and **US$ 31,212,337.86** of the Defendant Trinitas be restrained and attached, including but not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendants as described above (collectively "ASSETS"), including but not limited to such ASSETS as may be held, received or transferred in their individual names or as may be held, received or transferred for their benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.    That this Court retain jurisdiction over the matter while the High Court

case proceeds for purposes of any subsequent enforcement action as may

be necessary; and

d.    For such other, further and different relief as this Court may deem just and

proper in the premises.

Dated: New York, New York
      July 10, 2008

                           FREEHILL HOGAN & MAHAR, LLP
                           Attorneys for Plaintiffs

By:

                           Peter J. Gutowski (PG 2200)
                           Barbara G. Carnevale (BG 1651)
                           80 Pine Street
                           New York, NY  10005
                           (212) 425-1900
                           (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                       ) ss.:
County of New York  )

      PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our clients via their solicitors.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiffs are foreign entities, none of whose officers are presently within this Judicial District.

                                      Peter J. Gutowski

Sworn to before me this
10th day of July, 2008

Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# Ex. A

IN THE HIGH COURT OF JUSTICE       CLAIM NO: 2007 FOLIO 1301
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE

BETWEEN

### (1) WELLSTREAM INTERNATIONAL LTD
### (2) WELLSTREAM DO BRASIL INDUSTRIA E SERVICOS LTDA

Claimants

and

### (1) ATLANT HEAVY LIFT CORP. LTD
### (2) ATLANTSKA PLOVIDBA D.D.

Defendants

---

### PARTICULARS OF CLAIM

---

Introduction

1. In these Particulars of Claim

   a. the cargo described in 3 bills of lading dated 9th August 2006 is referred to as "the Cargo"

   b. the Claimants, together with the Insurers of the Cargo, are referred to collectively as "Wellstream"

   c. the First Defendants, a company incorporated in the Marshall Islands, are referred to as "Owners"

   d. the Second Defendants, a company incorporated in Croatia, are referred to as "Managers"

   e. the Defendants are referred to collectively as "Defendants"

   f. the vessel ATLANT TRINA is referred to as "the Vessel".

2. At all material times

   a. the Vessel was owned by Owners and was not under demise charter

   b. the Managers were the managers or technical managers of the Vessel

    c. Wellstream were the owners of the Cargo and/or were entitled to possession thereof and/or were the Insurers thereof.

3. By an agreement contained in or evidenced by a letter dated 16th October 2006 from UK P&I Club ("the Club Letter"), Wellstream and the Defendants agreed (among other things) that

    a. proceedings brought by Wellstream against the Defendants in the Brazilian courts be discontinued

    b. Wellstream's claims against the Defendants, whether arising in contract and/or tort and/or bailment or otherwise, should be subject to the exclusive jurisdiction of the English courts

    c. all issues as to the liability of the Defendants for such claims (including the amount of such liability and any defence raised by the Defendants) and all questions as to whether or in what amount the Defendants might limit their liability in respect of such claims, should be determined by the English courts applying the laws that would be applicable had such claims proceeded in Brazil before the Brazilian courts applying Brazilian law including Brazilian conflict of laws principles.

4. A copy of the Club Letter, to which the Claimants will refer for its precise terms and effect, is attached to these Particulars of Claim as Annexure 1.

**The facts**

5. On about 9 August 2006, the Cargo was shipped in good condition on board the Vessel at Newcastle upon Tyne for carriage to Niterol in Brazil. The Cargo comprised

    a.   17 special reels for flexible line transfer

    b.   boxed reels of oil export flexible riser and flowline bend stiffener

    c.   11 wooden crates containing 10 trunion rollers and 2 motors and 750 spray nozzles.

6. Shipment of the cargo as aforesaid and in apparent good order and condition is evidenced by 3 bills of lading dated 9 August 2006 issued by and/or on behalf of Trinitas Maritime Carriers BV. The bills of lading named Wellstream

as shippers and consignees.

7. The reels were stowed on and under deck. Sea fastening had been effected by means of steel fittings welded between the reels/frames and the Vessel's deck and/or hatch covers, together with stoppers welded to the Vessel's deck and/or hatch covers.

8. On about 25 August 2006, the Vessel arrived at Niteroi in Brazil. In the course of cargo operations in the evening of that day, a fire broke out on board the vessel and damaged the Cargo. At the time of the fire, only one reel had been discharged so that the majority of the Cargo was affected and damaged by the fire.

9. The best information which Wellstream can presently give (prior to disclosure, Further Information and/or interrogatories) as to the circumstances of the fire are as follows:

   a. At the commencement of discharge the Defendants, their servants or agents commenced removal of the sea fastenings. For this purpose, the Defendants were using a team comprising about 5 men with oxy-acetylene equipment and about 5 men with grinding tools.

   b. Cutting commenced at about 1800 hours on 25 August 2006, working forwards from the aftmost reels.

   c. The first reel was discharged at about 1925 hours.

   d. Even after the reel had been discharged, cutting work continued with oxy-acetylene being used to remove the stoppers.

   e. During the cutting with oxy-acetylene equipment, copious sparks and molten or burning metal were produced.

   f. The sea fastenings and stoppers were cut very low, generally to within 5-10 millimetres of the surface of the deck and/or hatch covers.

   g. As a result, there were several areas where the deck and/or hatch covers had been melted and, in at least one area (about 90 centimetres to starboard of the centre line in way of frame 78 in the no.5 hatch pontoon), a hole had been cut or burnt completely through the hatch covers and/or deck.

   h. This hole was above the inboard side of pipe reel WS23 which was stowed in the hold and was covered in a plastic tarpaulin.

   i. It is probable that falling molten metal or sparks fell through the hole on to the tarpaulin, which ignited and melted to spread fire around the

diameter of the reel and beneath the Cargo.

j.   At this stage, Wellstream cannot be precise about the timing of the outbreak of fire but will contend that it probably broke out before 1945 hours.

k.   Notwithstanding this, no notification was given either to the terminal or to those engaged in discharge or sea fastening removal that a fire had broken out in the hold.

l.   No notification was given to the local fire brigade by the Vessel. The fire brigade was not called until about 2025 hours. It appears that this notification came, not from the Vessel, but from a person employed by the port terminal who saw smoke rising from the Vessel.

m.   Despite the fact that the vessel was equipped with a $CO_2$ fire smothering system, no attempt was made to deploy this until about 2100 hours.

n.   However the deployment of $CO_2$ was unsuccessful and the fire spread to reels both under and on deck.

o.   The Fire Brigade arrived at about 2100 hours, by which time the fire was raging. 3 tugs with fire fighting capability were deployed at about 2130 hours. At about 2300 hours the large fire fighting tug Astro Ubarana came alongside and deployed its monitor. In the course of these fire-fighting measures damage was caused both to the shore crane alongside the Vessel and to the Vessel's cranes.

10. The damage to the Cargo was caused by the negligence, successive errors, neglect to act and/or lack of skill of those performing the unloading operation and/or of the Captain and/or crew. In particular, they

   a.   failed to remove the sea fastenings with any or any proper care and/or

   b.   carried out hazardous operations using oxy-acetylene burning without any or any proper care and/or

   c.   caused or permitted the hatch cover and/or deck plating to be burned through and/or

   d.   caused or permitted molten metal to fall onto the Cargo and/or

   e.   failed to exercise any or any proper supervision of the burning operation and/or

   f.   failed properly to guard against the risk of fire and/or

   g.   failed properly to bring the fire under control and to avoid the spread of the fire to other Cargo and/or

4

    h.  thereby caused or permitted the Cargo to be damaged.

11. Without prejudice to the generality of the foregoing and reserving the right to supplement these Particulars after disclosure and/or Further Information and/or Interrogatories, Wellstream will say

    a.  Given the obvious danger that molten metal or sparks could come into contact with the Cargo, which comprised and/or was wrapped in combustible material, the use of oxy-acetylene burning in the removal of sea fastenings should have been avoided. Grinders could and should have been used to free the cargo from sea fastenings.

    b.  Alternatively, if oxy-acetylene burning had to be used, its use should have been kept to an absolute minimum.

    c.  Once a reel had been freed and/or discharged, there was no necessity to remove all parts of the related sea fastening, such as stoppers, until after all other Cargo (or at least all other Cargo which might be imperilled by such operations) had been discharged.

    d.  Oxy-acetylene burning should not have been carried out so close to the deck and/or hatch cover surfaces.

    e.  Those performing the unloading operation and/or the Captain and/or crew failed to take any or any proper care to avoid melting or penetrating the deck and/or hatch cover surfaces.

    f.  Those performing the unloading operation and/or of the Captain and/or crew failed to take any or any proper care to avoid molten metal, sparks or other hazardous material falling onto the Cargo in the hold.

    g.  No or no proper hot-work procedures were implemented.

    h.  No or no proper fire watch was maintained in the hold. If it had been, the risk and/or fact of molten metal, sparks or other hazardous material falling onto the Cargo in the hold would have been appreciated and/or any burning of the Cargo avoided or extinguished promptly.

    i.  If any fire watch was maintained, it failed to detect the fire or to deal with it properly or at all.

    j.  The Captain and/or crew failed to deploy the Vessel's $CO_2$ fire smothering system with any or any proper care.

    k.  In particular, $CO_2$ was applied too late and/or only about half the designated quantity of $CO_2$ was deployed. For the hold, 60 45kg

bottles should have been released but it appears that only about 26 bottles were released.

l. After the deployment of $CO_2$, the Captain and/or crew negligently opened (or had failed to close) the hydraulically-operated flaps which are supposed to seal the joints between the hatch pontoons. This compromised the effectiveness of the gas which had been deployed. Not only did it permit air to enter the hold and/or $CO_2$ to be dispersed, it permitted hot gases to escape and to spread the fire into the deck cargo above.

m. No warning of the fire was given by the Captain or crew to the port terminal, port authorities or the fire brigade.

n. The fire brigade were not notified of the fire for at least 40 minutes after it had broken out.

12. Further or alternatively, the Owners and/or Managers and/or Captain and/or crew of the Vessel failed to take reasonable care to make the vessel fit and safe for the custody and carriage of the cargo. Further or alternatively, the Vessel was unseaworthy before and at the beginning of the voyage.

PARTICULARS

Without prejudice to the generality of the foregoing and reserving the right to supplement these Particulars after disclosure, Further Information and/or Interrogatories, Wellstream will say that the failure to prevent, control and/or extinguish the fire is attributable to a lack of care and/or negligence and/or unseaworthiness in any or all of the following respects:

(A) Supervision of sea fastening operations

(B) Lack of proper hot work procedures

(C) Lack of proper $CO_2$ procedures

(D) Lack of proper fire safety procedures

(E) Defective hatch panel flaps

A) **Supervision of sea fastening operations**

i. The Vessel had no or no proper system for the supervision of sea fastening operations (specifically the removal of sea fastenings) and, in particular, for ensuring that these operations were planned and carried out without danger to the Vessel or the Cargo

6

ii.  Further or alternatively, if the Vessel had such a system, the crew had not, or not properly, been informed of or trained to operate it and/or were not competent or efficient for the proper operation of the system.

iii.  Further or alternatively, no competent Captain or crew should or would have permitted oxy-acetylene cutting to be carried out in the way that it was, viz. in the vicinity of and above Cargo which might be set alight, close to the deck and/or hatch cover surfaces and so as to give rise to the risk of molten metal, sparks or other hazardous material falling onto the Cargo in the hold.

**(B)  Lack of proper hot work procedures**

iv.  The Vessel had no or no proper system for carrying out hot work on board, including for the planning and carrying out of hot work.

v.  In the event that hot work had to be carried out, a competent and properly-manned fire watch should have been in attendance at all areas where such work was carried out, properly equipped with functioning fire-fighting equipment to control and extinguish the fire.

vi.  Further or alternatively, if the Vessel had such a system, the Captain and/or crew had not, or not properly, been informed of or trained to operate it and/or were not competent or efficient for the proper operation of the system.

**(C)  Lack of proper $CO_2$ procedures**

vii.  The Vessel had no or no proper system for the use of her $CO_2$ equipment and the effective deployment of $CO_2$. In particular, it is essential for the prompt and safe operation of this equipment that procedures be in place for prompt evacuation of cargo spaces, deployment of $CO_2$ in sufficient quantity, ensuring that all openings into cargo spaces are closed before deployment and maintained closed thereafter.

viii.  Further or alternatively, if the Vessel had such a system, the Captain and/or crew had not, or not properly, been informed of or trained to operate it and/or were not competent or efficient

7

for the proper operation of the system.

**(D)  Lack of proper fire safety procedures**

ix.  The Vessel had no or no proper system for the implementation of proper fire safety procedures and/or for the training of the crew in such procedures.

x.  Further or alternatively, if the Vessel had such systems, the Captain and/or crew had not, or not properly, been informed of or trained to operate them and/or were not competent or efficient for the proper operation of the systems.

xi.  In support of these contentions, Wellstream will rely upon the following facts and matters:

1.  The Captain and/or crew failed to raise the alarm properly or at all.

2.  In particular, the Captain and/or crew failed to notify the terminal or to those engaged in discharge or sea fastening removal that a fire had broken out in the hold.

3.  No notification was given to the local fire brigade until about 2025 hours, about 45 minutes or more after the outbreak of the fire.

4.  The Captain and/or crew did not have and/or failed properly or at all to implement any contingency plans to deal with a fire in the cargo spaces

5.  The Captain and/or crew failed properly or at all to contain the fire and prevent it from spreading

6.  $CO_2$ was not deployed until about 2100 hours

7.  Insufficient $CO_2$ was deployed

8.  After the deployment of $CO_2$, the Captain and/or crew negligently opened the hydraulically-operated flaps which are supposed to seal the joints between the hatch pontoons. This compromised the effectiveness of the gas which had been deployed. Not only did it permit air to enter the hold and/or $CO_2$ to be dispersed, it permitted hot gases to escape and to spread the fire into the deck cargo above.

**(E) Defective hatch panel flaps**

8

xii.  The spread of the fire was increased and/or the effectiveness of fire-fighting measures (in particular deployment of $CO_2$) was prejudiced by the fact that the hydraulically-operated flaps which are supposed to seal the joints between the hatch pontoons were open.  To the extent that these could not be properly shut, they were defective and/or had not been properly maintained or operated.

13. The damage to the Cargo and resulting from the foregoing matters has caused loss to Wellstream, as more particularly set out at paragraphs 18-19 below.

**The Defendants' liability under Brazilian law**

14. In the above premises, the Owners and/or Managers are liable to Wellstream for the damage to the Cargo and resulting losses by reason of one or more of the following provisions of Brazilian law (and the principles they reflect)

a. **Article 519 of the Commercial Code** which provides that the Captain is regarded as the real depositary of the cargo and as such is bound to hold it in custody, good packing and preservation and for its prompt delivery against bills of lading;

b. **Article 529 of the Commercial Code** which makes the Captain responsible for any loss and damage that through his fault, omission or unskilfulness is caused to the cargo and which imposes civil liability on the Captain for damage on board caused by crew members to cargo items under his responsibility;

c. **Article 494 of the Commercial Code** which makes all owners and co-parties jointly liable for the damages the Captain may cause to a third party for lack of the due diligence he is bound to apply for the good custody, packaging and preservation of the goods received on board;

d. **Article 927 of the Civil Code** which provides that any person who causes damage to a person by means of unlawful conduct is liable to make good that damage ("unlawful conduct" having the sense used

under Article 186 of the Civil Code of "by voluntary omission or commission, negligence or imprudence, violating the rights of and causing damage to another");

e. **Article 932 of the Civil Code** which makes the employer and committed party liable for damages caused by his employees, servants or representatives in performing the work which they are assigned or because of it;

f. **Article 942 of the Civil Code** which makes the assets belonging to the party responsible for breaching or violating another person's right subject to reparation of damage caused and states that where more than one party participated in such violation, all shall be held jointly liable for such reparation;

g. **Article 565 of the Commercial Code** which treats the vessel as liable as regards the cargo owners for damages which the latter sustain due to petty offences, negligence or culpable omission perpetrated by the Captain or crew members while on duty on board;

h. **Article 470 of the Commercial Code** which, together with article 2 item IV of the International Brussels Convention dated 10th April 1926 (made applicable in Brazil under Decree no.351 of 1st October 1935), makes parties entitled to indemnification for cargo loss or averages privileged creditors with regard to the vessel.

15. Further or alternatively, the Owners and/or Managers failed to comply with the maritime authority rules and regulations known as the "Norma de Autoridade Marítima" or **"NORMAM"** imposed by the Brazilian maritime authorities and which were applicable both to Brazilian vessels and foreign vessels navigating in Brazilian waters. In particular, the Owners and/or Managers failed to comply with one or more of the following provisions of **Chapter 11 of NORMAM 1**

a. **Article 1101**, which requires vessels to be provided with personnel who shall be duly skilled to promptly respond to emergency situations and shall be perfectly acquainted with the environments, equipment, devices and facilities that can be used in emergency situations;

10

b. **Article 1102**, which obliges vessels to be equipped with a Table of Duties for emergency situations, stipulating for the closing of watertight doors, valves and flaps, for the use of firefighting equipment and installations, the use of communication equipment and so on;

c. **Article 1103**, which requires that the crew be trained and instructed in the operation and use of firefighting equipment;

d. **Article 1107**, which requires the implementation of firefighting drills;

e. **Article 1109**, which requires that materials and equipment comprising the security items of the vessel must be in usable condition at all times, so as to seek the best performance and efficiency of the same in emergency situations.

16. Further or alternatively, insofar as necessary, Wellstream will say that the standards and requirements imposed by Chapter 11 of NORMAM 1 are consistent with ordinary good maritime practice and/or they reflect the minimum standards of due diligence imposed upon the Owners, Managers, Captain and/or crew.

17. As a matter of Brazilian law, both Owners and Managers are responsible for defects in the Vessel and faults attributable to those performing the unloading operation and/or the Captain and/or crew which may have caused or aggravated the fire and its consequences. Without prejudice to the generality of this, the Claimants will rely upon terms of the foregoing provisions of Brazilian law and/or upon the facts that

a. Owners are a "paper company" incorporated in the Marshall Islands, probably for tax reasons, while Managers has responsibility for the management and/or operation of the vessel

b. Owners are the registered owners of the vessel but the Vessel is considered by the managers to form part of their fleet.

c. There is therefore a confusion of corporate or patrimonial nature between Owners and Managers, who both consider the vessel to be part of their fleet.

d. Both Owners and Managers profited from the employment of the

11

Vessel and shared in the risks attributable to the exploitation of this asset.

**Damages**

18. By reason of the facts and matters aforesaid, Wellstream have suffered loss and damage, including

    a.  damage to all reels (except the one discharged prior to the fire)

    b.  costs of returning damaged reels to the UK

    c.  costs of scrapping written-off reels

    d.  costs of repairing damaged pipes

    e.  costs of re-shipment to Brazil

    f.  loss of production and other costs relating to having to deal with the damaged reels

    g.  costs and liabilities incurred in Brazil in connection with firefighting and other operations.

19. The best particulars that Wellstream can presently provide as to this loss and damage are contained in the schedule which is attached to these Particulars of Claim as Annexure 2.

20. In the premises, Owners and the Managers are liable under Brazilian law to pay damages to Wellstream, such damages to indemnify Wellstream against all the foregoing losses.

21. The liability of the Defendants under Brazilian law includes a liability to interest upon the damages claimed, at a rate of at least 1% per month from the date of the casualty until payment, pursuant to Article 406 of the Civil Code and Article 161 of the National Tax Code.

22. Alternatively, Wellstream will claim interest pursuant to s.35A of the Supreme Court Act 1981, at a rate and for a period to be assessed.

AND THE CLAIMANTS CLAIM

(1) Damages

(2) Interest pursuant to Brazilian law

(3) Alternatively, interest pursuant to s.35A of the Supreme Court Act 1981, at a rate and for a period to be assessed

(4) Costs

(5) Further or other relief.

CHARLES PRIDAY

## STATEMENT OF TRUTH

The claimants believe that the facts stated in these Particulars of Claim are true.

I am duly authorised by the claimants to sign these Particulars of Claim.

Signed

Full name          STUART ANDREW ARMSTRONG

Position            Partner, Hill Dickinson LLP

Date                26 February 2008

SERVED this 27th day of February 2008 by Hill Dickinson LLP of Irongate House, Duke's Place, London, EC3A 7HX (ref. SAA/947616-109), solicitors for the Claimants

13

IN THE HIGH COURT OF JUSTICE          CLAIM NO: 2007 FOLIO 1301
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE


BETWEEN


(1) WELLSTREAM INTERNATIONAL LTD
(2) WELLSTREAM DO BRASIL INDUSTRIA E SERVICOS LTDA

Claimants


and


(1) ATLANT HEAVY LIFT CORP. LTD
(2) ATLANTSKA PLOVIDBA D.D.

Defendants


---

### ANNEXURE 1 IN RESPECT OF
### PARTICULARS OF CLAIM

---

Recd by email
16.10.06



**UK P&I CLUB**

OUR REFERENCE
RO/2006/005875

The Managers' London Agents
THOMAS MILLER P&I LTD
INTERNATIONAL HOUSE
26 CREECHURCH LANE
LONDON EC3A 5BA

YOUR REFERENCE

TEL: +44 20 7283 4646
FAX: +44 20 7283 5614
TLX: B85271 MUTUAL G
DX621 LONDON/CITY EC3
WEBSITE: WWW.UKPANDI.COM

16 October 2006

PLEASE REPLY DIRECT TO:
TEL: +44 20 7204 2486
FAX: +44 20 7204 2104
E-MAIL: london4.ukclub@thomasmiller.com

To Wellstream International Ltd, Wellstream do Brasil Industria e Servicos Ltda and cargo underwriters
(together referred to as "Wellstream") c/o Hill Dickinson LLP, Sun Court, 66-67 Cornhill, London EC3V
3RN

Dear Sirs

**"ATLANT TRINA" ("the Ship") at Niteroi, August/ October 2006**
Cargo as referred to in bills of lading nos. 01, 02 and 03 dated Newcastle upon Tyne 9 August 2006
(copies attached)
Losses suffered and to be suffered by Wellstream consequent upon a fire on board the Ship on and
after 25 August 2006

In consideration of your agreeing to the release of the Ship from your arrest and in consideration of your
agreeing not to re-arrest the Ship or arrest any other vessel in the same ownership, management or control
in any part of the world for the purpose of founding jurisdiction and/or obtaining security in respect of
claims against the owner of the Ship in respect of the losses referred to above whether arising in contract
and/or tort and/or bailment or otherwise ("the Claim")

1.  We agree to pay to your solicitors in London within 14 days of a written demand any sum or
    sums which may be found to be due from the owner of the Ship (Atlant Heavy Lift Corp. Ltd)
    ("the Owners"), in respect of the Claim or any part thereof and/or interest and/or costs following
    any final and unappealable judgment or order of an English court or as may be agreed to be due,
    provided always that our liability hereunder shall not exceed the sum of USD 13 million (thirteen
    million US Dollars) plus any sum or sums awarded or agreed in respect of interest and/or costs.

2.  The Owners warrant that Atlant Heavy Lift Corp. Ltd owned the Ship throughout August 2006
    and that the Ship was not at any material time on demise charter.

3.  We further confirm that the Owners and the Managers (Atlantska Plovidba d.d.) hereby agree that

    (a) both the Claim and any claim that Wellstream might have against the Managers in respect of
    the losses referred to above whether arising in contract and/or tort and/or bailment or otherwise

THE UNITED KINGDOM MUTUAL STEAM SHIP ASSURANCE ASSOCIATION (BERMUDA) LIMITED INCORPORATED IN BERMUDA
THOMAS MILLER P&I LTD. REGISTERED IN ENGLAND No 1901414 AS ABOVE. A MEMBER OF THE THOMAS MILLER GROUP OF COMPANIES.



UK P&I CLUB

(jointly referred to hereinafter as "the Two Claims") shall be subject to the exclusive jurisdiction of the English courts;

(b) all issues as to the liability of the Owners and the Managers for the Two Claims (including the amount of such liability and any defence raised by the Owners and/or the Managers) and all questions as to whether or in what amount Owners and/or the Managers might limit their liability in respect of either or both of the Two Claims (whether by reference to the size, weight or tonnage of the Ship or cargo or the number of packages thereof or otherwise howsoever) shall be determined by the English courts applying the laws that would be applicable had the Two Claims proceeded in Brazil before the Brazilian courts applying Brazilian law including Brazilian conflict of laws principles;

(c) for the avoidance of doubt and without prejudice to the foregoing:

   (i)    proceedings before the English courts shall be conducted in accordance with the Civil Procedure Rules,

   (ii)   whilst the incidence of the burden of proof shall be determined in accordance with sub-paragraph (b) above, the evidentiary weight to be given by the English courts to all aspects of evidence (both factual and expert) shall be in accordance with English law rules in that regard;

(d) Bentleys, Stokes & Lowless have irrevocable authority to accept service of proceedings in personam brought against the Owners and the Managers in respect of either or both of the Two Claims by Wellstream in the English courts;

(e) no application shall be made by the Owners or the Managers or us to the English courts for security for costs in any proceedings in connection with either or both of the Two Claims or for a stay of proceedings brought by Wellstream in the English courts;

(f) the Owners and the Managers will consent to the discontinuance (with no order as to costs) of all the proceedings (including 2006.002.066360-3 and 2006.002.066899-6 and 2006.002.068311-0) commenced on behalf of Wellstream before the court at Niteroi (the "Niteroi proceedings") and to the return of security posted on behalf of Wellstream in the Niteroi proceedings and will join in an application or applications to the court at Niteroi for that purpose, provided that the same joint application(s) will request the immediate release of the Ship from the arrest order now in effect;

(g) the costs incurred by Wellstream and the Owners and the Managers in connection with the Niteroi proceedings shall be treated as costs in the case in proceedings in respect of the Two Claims brought before the English courts;

(h) each party in the Niteroi proceedings shall, in the first case, discharge the fees and disbursements of their own lawyers. Such fees and disbursements shall be recoverable from the other party or parties insofar, and only insofar, as they are recoverable in accordance with the preceding clause, 3(g).



UK P&I CLUB

4.   We are duly authorised by the Owners and the Managers on their behalf to make the agreements
     and give the warranties contained herein.

5.   We and the Owners and the Managers agree that this guarantee is subject to English law and to
     submit to the jurisdiction of the English courts in proceedings relating to (including proceedings
     to enforce) this guarantee.

Yours faithfully

M. C. Bowen
Thomas Miller P&I Limited
as agents for Thomas Miller (Bermuda) Ltd.
Managers
For and on behalf of The United Kingdom Mutual Steam Ship
Assurance Association (Bermuda) Limited

# ANNEXURE 2

| | | USD | Brz.Reals | £ |
|---|---|---|---|---|
| **1.0 : BRAZIL COSTS** | | | | |
| 2nd claimants' labour costs | a) Recorded manhours x direct rate and overhead apportionment | | 123,866.72 | |
| | b) Additional discharge activities over and above ordinary tasks | | 629,194.00 | |
| **3rd Party costs** | 3rd Party Invoices | | | |
| Transport Brazil to Newcastle | Trinitas Invoice 10814 | 472,500.00 | | |
| Demurrage in Brazil | Trinitas Laytime calculation | 53,100.00 | | |
| Crane Repairs (saltwater damage) | | 18,182.00 | 607,000.00 | |
| Mobilisation of temporary replacement crane | To assist fire damage clearance and return loading etc. | | 150,000.00 | |
| Demobilisation | | | 250,000.00 | |
| Rental of temporary crane | | | 440,000.00 | |
| Repairs to crane belt | Caused when moved manually to prevent further fire/seawater damage) | | 520,000.00 | |
| Soil Repairs | S.J. Transportes | | 50,000.00 | |
| Floating Barrier protection | Hydroclean | | 70,000.00 | |
| Fire fighting – Kidroclean onshore team | | | 82,410.00 | |

# ANNEXURE 2

| | | USD | Brz Reals | £ |
|---|---|---|---|---|
| **2.0 : UK COSTS : 3rd Party costs (replacement of written off Reels)** | | | | |
| Replacement Reels | Forsythes quotation 14146-07 | | | 380,755.00 |
| SOS Offload | | | | 3,490.00 |
| LV Shipping – transportation to test facility | | | | 88.00 / 95.50 |
| RAPRA Technology – MFT samples | | | | 1,136.00 / 720.00 |
| Arkema CIV testing | | | | 895.16 / 223.79 / 1,566.53 |
| Lloyds register EMEA – CRP Insullation test witness | | | | 1,700.65 / 705.00 |
| MIS Testing Ltd – hardness testing | | | | 600.00 |
| Townes Lifting and testing – re-certify reels/D rings | | | | 742.00 |
| Hamburg Uni | | | | 753.70 / 9,200.73 |
| **3.0 : UK COSTS : 3rd Party Costs (scrapping)** | | | | |
| AQUATIC Under rollers – for unspooling written off pipe to allow scrapping process | SI 10719 SI 10718 | | | 18,290.00 / 24,382.50 |

M:\Drops\Drops\SAG\WORD\COMM\ANNEXURE Cust\ANNEXURE 2.doc\HG
26/02/08

# ANNEXURE 2

| | | USD | Brz Reals | £ |
|---|---|---|---|---|
| SOS Reinforcement of reels | Inv 10438<br>Inv 10441 | | | 1,370.00<br>2,173.00 |
| WD CLOSE Plates for reel refurbishment | | | | 810.72 |
| Shepherds Offshore services invoices (Pipe scrapping) | 10520<br>10521<br>10522<br>10523<br>10524<br>10525<br>10526<br>10527 | | | 27,669.00<br>7,268.00<br>2,777.00<br>27,835.50<br>5,437.50<br>7,951.00<br>10,500.00<br>4,500.00 |
| Shepherds Offshore services invoices (Reel scrapping) | 10440<br>10579<br>10580<br>10581<br>10582<br>10606 | | | 1,968.00<br>7,060.00<br>4,048.00<br>14,298.50<br>8,086.00<br>384.00 |
| JEBB – Pipe scrapping | Inv. 3205/ticket 42004 (part)<br>Inv. 3575/ticket 01411<br>Inv 3283/00151 (part), 00166, 00180 | | | 1,508.00<br>1,319.85<br>601.00 |
| JEBB – Reel Scrapping | Inv. 3454/ticket 00982, 01042, 01097, 01099 | | | 4,944.00 |
| K2 : Pipe scrap costs/sales | Inv 2566 (part)<br>Inv 2595 (part)<br>Inv 2596<br>Inv 2597 | | | 660.50<br>660.50<br>125.50<br>7,874.67 |
| | Inv 2611 | | | 21,565.00 |

M:\Client\Energy\DAVE SYDROIS\CHANGE\ATLANTIC\KNOCK.doc\ANNEXURE 2.doc\HO 26/02/04

# ANNEXURE 2

| | | USD | Brz Reals | £ |
|---|---|---|---|---|
| | Inv 2613 | | | 1,998.40 |
| | Inv 2614 | | | 557.50 |
| | Inv 2614 | | | 357.00 |
| | Inv 2614 | | | 779.00 |
| | Inv 2614 | | | 960.50 |
| | Credits | | | |
| | | | | 1,226.02 |
| | | | | 926.08 |
| | | | | 1,444.66 |
| | | | | 108.32 |
| O'Brien scrap tickets (Pipe salvage haulage) | 64247 | | | 1,131.20 |
| | 64249 | | | 1,030.40 |
| | 64251 | | | 1,060.80 |
| | 64258 | | | 6,110.40 |
| | 64260 | | | Inc above |
| | 64262 | | | Inc above |
| | 64269 | | | Inc above |
| | 64271 | | | Inc above |
| | 64275 | | | Inc above |
| **4A : Write offs/Remanufactured Pipes** | | | | |
| SALES PRICE | PO provides pricing for several Km of Flowline : a unit rate of GBP£577.50 for this design WSI 152.1518 and the length provided on this Reel was 1255m | | | 724,386.00 |
| SALES PRICE | PO provides pricing for several Km of Flowline : a unit rate of GBP£577.50 for this design WSI 152.1518 and the length provided on this Reel was 1255m | | | 724,386.00 |
| SALES PRICE | PO provides pricing for several Km of Flowline : a unit rate of GBP£577.50 for this design WSI 152.1518 and the length provided on this Reel was 1255m | | | 837,375.00 |

M:\Cases\Feap\nGAAS\WORKED\WORD\PLANT\TREWWA.doc\ANNEXURE.2.doc\PRD 20020208

# ANNEXURE 2

| | | USD | Brz Reals | £ |
|---|---|---|---|---|
| **4B – damaged Pipes/Repaired** | | | | |
| Raw materials | | | | 344,330.00 |
| Direct Manhours | 4325 direct m/hrs @ £58.72 (includes overhead appointment) | | | 253,964.00 |
| FM Steelstock<br>Townes Northern Ropes<br>Arco<br>M&S Bolt Supplies | 9" Buckles for stripping tool<br>Wrecking bars<br>Bolts for Stripping m/c floor fixing | | | 681.00<br>128.06<br>66.59<br>65.70 |
| Lord Tool Hire | Floor scrubber hire | | | 172.00 |
| Lord Tool Hire | Additional scrubber hire | | | 185.90 |
| **5 – Return to Brazil** | | | | |
| SOS Loadout/Seafastening – Geija | Inv 10439 | | | 7,812.00 |
| SOS loadout to Xenia<br>SOS Seafastening to Xenia<br>SOS mods to reel | | | | 1,455.00<br>1,125.00<br>7,825.00 |
| HAUTIN Tarpaulins – Tarps for reels | | | | 5,125.00 |
| Port Charges for return to Brazil | Invoice OP/1004238 26th Jan 2007 (relevant part)<br>Invoice OP/1004238 26th Jan 2007 (relevant part) | | | 1,739.55<br>2,319.40 |
| Detention charges in NCL | | | | 10,708.45<br>17,847.41<br>7,825.00 |
| Return transport to Brazil | Trinitas charges for 3 reels<br>Estimate based pro rata on above for 5 reels | | | 218,882.62<br>364,804.37 |

M/Conrad/Kerja0oo3/SYL01/2020/OAO/OAO/UMT TRI/ANUK.doc/ANNEXURE 2.doc/ HD
20022008

## ANNEXURE 2

| | | USD | Brz Reals | £ |
|---|---|---|---|---|
| | | | | |
| Offloading pipes in Brazil | Estimate | | 50,000.00 | |
| Claim production costs | Claim Manager @ $1,080/day ($23,760/month) over 12 month period x 15% involvement | 42,768.00 | | |
| Losses incurred as a result of having to re-arrange intended shipping programme | | | | To be advised |
| Loss of profits consequent upon disruption of manufacturing process due to need to effect repairs to damaged reels and re-manufacture total loss reels | | | | 1,674,830.00 |

TOTALS    $96,550.00   3,556,157.71   5,760,7822.14

E. & O.E.   Confirmation as to the accuracy of the above figures and as to any further expenses incurred (but which have been omitted from this schedule) will

be provided in due course.

Ex. B

(A)    **Wellstream's Claim – Particulars Of Claim**

<u>ANNEXURE 2</u>

|     |                              | USD          | Brz Reals       | £ sterling      |
|-----|------------------------------|--------------|-----------------|-----------------|
| (1) | Brazil Costs                 | 543,782.00   | 2,922,470.72    |                 |
| (2) | UK Cost/3rd Party            |              |                 | 402,672.06      |
| (3) | UK Cost/3rd Party            |              |                 | 233,768.02      |
| (4A)| W/O/Remanufactured P.pes     |              |                 | 2,286,147.00    |
| (4B)| Damaged P.pes/Repaired       |              |                 | 599,593.25      |
| (5) | Return to Brazil *           | 42,768.00    | 633,666.99      | 1,738,611.81    |
|     |                              | US$586,550.00| BrzR3,556,157.71| £5,260,782.14   |

* This includes loss of profits due production disruption = £1,674,830.06

* Also includes reservation for losses resulting from disrupted shipping programme

Add interest at 12% per annum for say 5 years = 60% uplift on above totals =
US$351,930.00 - BrzR2,133,694.63 - £3,156,469.28

Total inclusive of 5 years interest

US$586,550.00 + US$351,930.00 = US$938,480.00
BrzR3,556,157.71 + BrzR2,133,694.63 = BrzR5,689,852.34
£5,260,782.14 + £3,156,469.28 = £8,417,251.42

Convert at £1 = US$1.98: BrzR1 = US$0.6

Therefore BrzR5,689,852.34 X 0.6 = US$3,413,911.40
£8,417,251.42 X 1.98 = US$16,666,157.81

Therefore US$938,480.00 + US$3,413,911.40 + US$16,666,157.81 = US$21,018,549.21

Add Costs of approximately £1,000,000.00 at £1 = US$1.98 = US£1,980,000.00

Total of Wellstream's currently pleaded claim inclusive of interest and costs =
Approximately US$23,000,000.00

Ex. C

<u>IN THE HIGH COURT OF JUSTICE</u>                     <u>2007 Folio 1301</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

B E T W E E N:-

(1)  WELLSTREAM INTERNATIONAL LTD

(2)  WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

<u>Claimants</u>

and



(1)  ATLANT HEAVY LIFT CORPORATION LIMITED

(2)  ATLANTSKA PLOVIDBA D.D.

<u>Defendants</u>

and

TRINITAS MARITIME CARRIERS BV

<u>Third Party</u>

---

DEFENCE AND COUNTERCLAIM
OF THE DEFENDANTS

---

<u>DEFENCE</u>

<u>Introduction</u>

1.    Save where the contrary appears:

   (1)   References to paragraph numbers are to the paragraphs of the Particulars of
         Claim;

   (2)   The terminology used in the Particulars of Claim is adopted with no admissions to
         be implied thereby, and

   (3)   The allegations in the Particulars of Claim are denied.

2.    Paragraph 1 is noted.

3.    In addition the Defendants will refer to the following further parties:

1

(i)     The Third Party, Trinitas Maritime Carriers BV ("Trinitas"), the sub-sub-time charterers of the Vessel; and

(ii)    Marine Heavy Lift Partners BV, a specialist company appointed by Trinitas, to design the sea fastening used to secure the cargo to the deck.

4.      Paragraph 2 is admitted.

5.      By a Contract of Affreightment between Trinitas as carriers and the First Claimants as shippers, entered into on or about 14 July 2005 ("the Trinitas COA"), contained in or evidenced by a document entitled "Additional Clauses to Carriers' Bill of Lading Form" which was signed on behalf of both parties, it was agreed that all of the Wellstream's shipments of reels from Newcastle Upon Tyne to Brazil of its cargo of reels and associated equipment would be carried by Trinitas upon the terms set out in that document.

6.      The terms of the Trinitas COA included, amongst others, the following:

"20- Obligations of the parties
During the term of this agreement the fundamental principles upon which this commercial arrangement is founded are outlined below:
i)      Wellstream shall exclusively utilise the services of Trinitas for all of its reel shipments between Newcastle and Brazil...

21 -- Shipping Terms
.....
Free out and in unstowed, un-lashing, un-securing, un-dunnaging at Brazilian port."

7.      Paragraph 3 is admitted. The Defendants will refer as necessary to the letter dated 16 October 2006 for its full terms, meaning and effect.

8.      Paragraph 4 is noted.

The facts
9.      The first sentence of paragraph 5 is admitted.

10.     As to the second sentence of paragraph 5, it is admitted that the cargo comprised

(i)     17 reels of pipe for the sub sea oil industry which had been manufactured to fulfil the requirements of a contract between Wellstream and Petrobras, the Brazilian national oil company. The pipe was a composite material designed for high-pressure sub sea applications. The inner pipe was a flexible stainless steel pipe and there were various layers covering the inner pipe many of which were

2

made of different types of plastic. For storage and carriage purposes the pipe was coiled onto steel reels. The reels were about 8.5 m in diameter and a little over 6 m wide;

(ii)     11 wooden crates said to contain 10 Trunion Rollers and 2 Motors 750 Spray Nozzles;

(iii)     10 boxes said to contain Oil export flexible raiser and flowline bend stiffener.

Save as set out above, the second sentence of paragraph 5 is not admitted.

11. Paragraph 6 is admitted.

12. As to paragraph 7:

i       it is admitted that 5 of the reels were stowed on deck and that the balance of the cargo was stowed under deck;

ii      the reels which were stowed on deck were secured to the deck as set out below:

a.     20 mm thick steel plates were placed on edge and each was welded to both the foot of the reel and the deck ("the sea fastenings"). There were five sea fastenings on each foot (each reel consisting of two feet) usually arranged three on the outside face of the foot and two on the inside face. The sea fastenings were designed by Marine Heavy Lift Partners BV at the request of Trinitas;

b.     At either end of each foot were steel structures constructed from 20 mm thick steel ("the end stops"). The end stops were welded to the deck, but not to the foot of the reel and were designed to provide fore and aft restraint. These were also designed by Marine Heavy Lift Partners BV at the request of Trinitas;

c.     In addition, extra chain lashings were supplied to those reels stowed on deck and the two forward in the hold.

iii.     Save as set out above, the second sentence of paragraph 7 is not admitted.

## The Voyage

13. The crossing from Niteroi took 15 days and was without incident. Prior to arriving at Niteroi, Trinitas engaged Ominato Servicos e Construcoes Ltda ("Ominato") to carry out hot works on behalf of themselves and Wellstream.

3

14. The vessel arrived off Niteroi, Brazil on August 25, 2006 at about 0550 hours local time. The pilot boarded at about 1335 hours and brought the vessel into port, bringing her alongside at about 1500 hours. Save as set out in this paragraph above, the first sentence of paragraph 8 is not admitted.

Niteroi

15. Ominato brought about 12 men aboard the vessel. Four or five were to be engaged in oxy-acetylene cutting operations, three were to use grinders and the remainder provided assistance and support. These men included their Managing Partner, a Mr Bussolotti. The proposed removal of the sea-fastenings was discussed by the Chief Officer with Mr Schreiter (the Supercargo) and Mr Bussolotti. It was agreed that the following procedure would be followed:

  (i)     operatives were to make a first cut to 2/3cm above the deck before discharge to permit removal of the reels;

  (ii)    then, after the reel had been discharged a second cut was to be made to a height sufficiently away from the deck/hatch covers to prevent the risk of damage; a distance of approximately 10mm above the deck was agreed. The cutting was to be done in such a way as to avoid damage to the vessel;

  (iii)   thereafter the remaining parts of the sea fastenings and end stops would be removed by grinding.

16. A Hot Work Permit was completed and counter-signed on behalf of Ominato, by Mr Bussolotti. Two fire hoses were laid out on deck and a fire extinguisher was placed on deck near to where hot works were to be carried out, as part of the precautions put in place for the hot works. Furthermore the Bosun was put on fire watch in the hold.

17. Hot works commenced shortly after about 1830 hours. Work commenced upon the reels on deck from the aft of the Vessel moving forwards.

18. At about 1925 hours the aftmost reel (No. WS-129) was unsecured and discharged from the Vessel using the shore crane provided by the terminal. Shortly thereafter the Ominato employees returned to cut down the sea fastenings and end stops for that reel. Whilst cutting away the forward inboard end stop an operator allowed the flame of the oxy-acetylene torch to penetrate the surface of the hatch cover of the vessel and burn a small hole through the plating in the vicinity of frame 78.

4

19. As a result of the hole being burned in the hatch cover, molten metal and/or sparks fell into the hold. The material first ignited was the tarpaulin used to protect the outer layer of pipe on the reel WNC-23, which was stowed in the hold below the starboard side of hatch cover 5.

20. The Defendants will say that it is probable that the structural strength of the tarpaulin was compromised almost immediately and that the burning material fell from the reel to between reels WNC-23 and WS-87 and continued to burn beneath the reel. Flames and hot gases rising between the two reels ignited the cargo on reel WNC-23.

21. At some time between 19:35 and 19:45 hours the alarm sounded and indicated that there was smoke in the hold.

22. In the period after the alarm sounded:

    (i)     the crew investigated the hold to ascertain the nature and extent of any fire;

    (ii)    thereafter the crew took steps to fight the fire within the hold using fire hoses;

    (iii)   at about 20:30 hours smoke was reported on deck and the Master ordered that CO2 be deployed in the hold and fire hoses on deck;

    (iv)    the necessary preparations were made before the release of CO2, including the closing of all openings and ensuring that the Hold had been evacuated. Shortly before 21:00 hours 26 bottles of CO2 were released into the hold and this successfully extinguished the fire in the Hold;

    (v)     in the meantime the fire on deck developed rapidly. Flames started at the base of reel WS-105 close to the deck and quickly spread up and round the reel.

23. The Ominato employees left the Vessel immediately after the sounding of the alarm leaving their cutting gear, grinding equipment and other equipment on deck. Some of the abandoned torches were left in the open position.

24. The Fire Brigade arrived at about 21:00 hours. At about 21:30 hours two harbour tugs arrived alongside followed shortly by a third. These vessels were equipped with firefighting monitors and joined the firefighting. Water was directed onto the reels forward of the burning reel in an attempt to prevent fire spreading to these. This was not successful and the material on reel WNC-64, adjacent to WS-105, ignited.

25. At about 23:00 hours an offshore supply vessel, M/V ASTRO UBARANA came alongside, the other tugs withdrew and ASTRO UBARANA took over firefighting operations. This vessel was equipped with two powerful fire monitors.

26. During the morning of 28 August 2006 the intensity of the fire diminished. At about 16:45 hours a floating crane in the harbour was brought alongside and at about 18:20 hours reel WS-105 was lifted over the port bulwark and immersed in the sea to extinguish the fire. The fire burning on reel WNC-64 was less intense than it had been and by about 20:00 hours the fire in reel WNC-64 appeared to be extinguished.

27. During the course of the fire fighting by the tugs and M/V ASTRO UBARANA damage was caused to the Vessel, her cranes and the shore crane.

28. Save as insofar as it is consistent with the matters set out at paragraphs 9-27 above, paragraph 9 is denied.

The Allegations of negligence and lack of care

29. Paragraph 10 is denied.

30. In particular in response to the matters set out in paragraph 10 the Defendants will say:

    (i)    the matters alleged at paragraphs (a) to (d) of paragraph 10 relate to the acts or omissions of Ominato who were not, at any material time, the servants or agents of the Defendants;

    (ii)    in fact, Ominato were the servants or agents of

        (a)    Trinitas, by reason of the fact that they were directly appointed by them and acted under their instructions; and/or

        (b)    Wellstream, by reason of the fact that Wellstream were responsible for performing the discharge of the Vessel at Niteroi under the Trinitas COA and hence Ominato were their agents/delegates.

    (iii)    neither of the Defendants was negligent or failed to take sufficient care or skill or committed successive errors as alleged at paragraphs (e) to (g) of paragraph 10;

(iv)    In any event the matters alleged at paragraphs (e) to (g) of paragraph 10 did not cause the loss complained of by Wellstream.

31.  In relation to the particulars provided at paragraph 11 the Defendants respond as follows:

(i)    the use of oxy-acetylene torches to cut welded steel on deck is a common, efficient and safe working method so long as Hot Working procedures are followed and cutting does not take place very close to the deck. There is nothing inherently unsafe or negligent about permitting such a practice. Accordingly, it is denied that this method should not have been used or should have been kept to a minimum as alleged at sub-paragraphs (a) and (b). Insofar as it is necessary the Defendants will rely upon the fact that both Trinitas and Wellstream (being the parties responsible for the loading and discharge of cargo respectively under the COA) and the Supercargo, Mr Schreiter, permitted hot works to be carried out at both Newcastle and in Brazil on the previous voyage from Newcastle to Brazil which commenced on 19 June 2006 and at Newcastle on this voyage.

(ii)    There is nothing inherently unsafe or imprudent in permitting the use of oxy-acetylene torches to cut down the sea fastenings and end stops welded to the deck after each reel is discharged so long as Hot Working procedures are followed and cutting does not take place very close to the deck i.e. within 5mm of the deck. Accordingly, in response to sub-paragraph (c):

(a)  the Defendants admit that there was no necessity to remove all parts of the sea fastenings and end stops;

(b)  the Defendants deny that the works carried out on deck on 25 August 2006 involved or were ever intended to involve the removal of all parts of the sea fastenings and end stops. The remaining parts of the fastenings and end stops were to be removed by grinding;

(c)  if carried out with sufficient care and in accordance with the instructions not to cut too close to the deck, there was nothing unsafe or negligent about permitting further cutting work upon the sea fastenings and end stops welded to the deck after each reel was discharged.

7

(iii)   The procedure agreed by the Chief Officer and referred to at paragraph 15 above was clear. If the Ominato employees had exercised reasonable skill and care in carrying out the cutting works and had complied with the procedure then damage to the deck and hence the consequent fire would not have occurred. Accordingly, it is denied that there was any failure on the part of the crew or any other servants or agents of the Defendants, whether as alleged at sub-paragraphs (d), (e) or (f) or at all.

(iv)   Sub-paragraph (g) is denied. Hot Work procedures were followed as is evidenced by the Hot Work Permit referred to at paragraph 16 above.

(v)   The first sentence of sub-paragraph (h) is denied. In any event, it is denied that a fire watch maintained in the hold would have meant that any burning of the cargo would or could have been avoided or extinguished as alleged in sub-paragraph (h).

(vi)   It is denied, as is alleged at sub-paragraph (i), that the failure of the Watch immediately to detect or extinguish the fire reflects or evidences deficiencies in the Watch. If necessary the Defendants will in any event contend that in the particular circumstances of this case and in particular

(a)   the temperature of the molten material and sparks entering the hold; and

(b)   the flammability of the tarpaulins and the cargo; and

(c)   the difficulties in obtaining effective access to all parts of the hold because of the way the cargo was stowed

meant that it was very unlikely that immediate detection of the fire would have permitted it to be extinguished before it was established in the Hold.

(vii)   Sub-paragraphs (j) and (k) are denied. In response to those sub-paragraphs the Defendants will say as follows:

(a)   In attempting to fight the fire in the hold using the Vessels' fire appliances, the crew acted with reasonable skill and care and in accordance with the guidance provided in the Vessel's SMS Manual which recommends, upon discovery of a fire that attempts

8

are made to extinguish the fire using available equipment before sealing the relevant area. The SMS Manual at Part 2, section 2, paragraph 5.29 states:

*"Prompt action when a fire is first discovered is vital. A fire can often be dealt with easily in the early stages. On discovery of a fire:*

*1.  Initiate the fire alarm*

*2.  If a fire is in the early stages try to put it out by any convenient means – fire extinguisher*

*3.  If the fire continues to burn, evacuate and seal off the space."*

(b)  An appropriate quantity of $CO^2$ bottles was deployed. The Operating Manual for the Vessel's $CO_2$ System provides at C10 p. 1. as follows:

*"The instruction plan states the theoretical number of $CO_2$ cylinders normally necessary to extinguish a fire. As an emergency contribution onboard ships with dry cargo approx. one third of the stated number of cylinders are applied; thereafter, as required, for instance one cylinder per half hour"*

Accordingly by deploying 26 bottles the crew were following this recommendation. In any event the deployment of the bottles was effective to extinguish the fire in the Hold.

(viii)  Sub-paragraph (i) is denied. It is denied that the Master or crew negligently opened the hydraulically operated flaps as alleged and in any event

(a)  It is denied that the effectiveness of the deployment of the $CO_2$ was compromised. In fact it was very effective and extinguished the fire in the Hold;

(b)  It is denied this permitted the fire to spread to the deck. The Defendants will contend that the fire had already spread on to the deck before the deployment of the $CO_2$.

(ix)  Sub-paragraphs (m) and (n) are not admitted. The Master requested that the Supercargo inform the local fire brigade when it became apparent to him that the fire could not successfully be fought by the crew, at or around 20:30

hours. By this time the Fire Brigade appears already to have been informed of the fire. In any event it is denied that any delay on the part of the captain or the crew was negligent or that it caused any of the loss complained of by Wellstream.

32. In summary it is the Defendants' case that:

(i)     the effective cause of the fire and consequent losses was the negligence and/or lack of skill and care and /or lack of prudence on the part of the Ominato employees using oxy-acetylene torches, in permitting or failing to prevent the oxy-acetylene torches from penetrating the surface of the hatch cover of the vessel and burning a small hole through the plating in the vicinity of frame 78;

(ii)    Article 932 of the Brazilian Civil Code identifies persons who are liable in respect of Civil Compensation for the acts of others and in the material passage that Article provides that the following are liable in that way:

> "....
>
> *III – The employer or principal in respect of their employees, servants or agents when performing the work they have been assigned or because of these;*
>
> Article 933 of the Brazilian Civil Code further provides as follows:
>
> *"The person designated in items I to IV of the preceding Article, even if there is no fault on their part, shall be liable for the acts committed by the third parties referred to therein."*

(iii)   The Ominato employees identified at sub-paragraph (i) above were not the servants or agents of the Defendants within the meaning of Article 932 and 933 of the Brazilian Civil Code and accordingly the Defendants are not liable for their negligence and/or lack of skill and care and /or lack of prudence;

(iv)    In fact, pursuant to Article 932 and 933 of the Brazilian Civil Code, Trinitas are liable for the negligence and/or lack of skill and care and /or lack of prudence of Ominato employees, by reason of the fact that they engaged Ominato who were acting for their account and upon their instructions. Insofar as it is necessary the Defendants will also contend that Trinitas are liable because of their failure to appoint sufficiently competent or skilled agents and their failure

10

to supervise their works: the Brazilian doctrines of *culpa in eligendo* and *culpa in vigilando* as more fully set out in the Particulars of Claim against Trinitas.

(v)    Further, pursuant to Article 932 and 933 of the Brazilian Civil Code, Wellstream are liable for the negligence and/or lack of skill and care and /or lack of prudence of Ominato employees, by reason of the fact that they were responsible for discharging the cargo at Niterol under the Trinitas COA and delegated that responsibility to Trinitas who, in turn, engaged Ominato. Insofar as it is necessary the Defendants will also contend that Wellstream, in delegating that responsibility to Trinitas, are liable because of their failure to appoint sufficiently competent or skilled agents and their failure to supervise their works: the Brazilian doctrines of *culpa in eligendo* and *culpa in vigilando*.

(vi)    Neither the Captain nor the crew acted negligently and/or with a lack of skill and care and /or lack of prudence whether as alleged or at all;

(vii)    In any event, the facts and matters alleged as against the Captain and/or the crew did not cause the fire and did not cause any of the loss claimed by Wellstream. In the circumstances:

(a)    the Defendants are not liable to Wellstream under Articles 494 and/or 519 and/or 529 and/or 565 of the Brazilian Commercial Code as alleged;

(b)    the Defendants are not liable to Wellstream under Articles 927 and/or 932 of the Brazilian Civil Code as alleged; and

(c)    Article 942 of the Brazilian Civil Code and Article 570 of the Brazilian Commercial Code have no application as against the Defendants.

**The failure to take care to ensure the Vessel was fit to carry the Cargo/Seaworthiness**

33.    Paragraph 12 is denied. The allegations made in this paragraph are very general and lack the necessary particularity. Pending provision of full and proper particulars of the Claimants' case and whilst reserving the right to plead further thereto once such particulars are provided, the Defendants respond to the specific allegations below in so far as they are able to do so.

11

34. At the time of the incident, the Vessel was in possession of a valid Safety Management Certificate issued by the Republic of Croatia on 10th July 2006 following a survey completed on 14th June 2006. On the same day, a Safety Inspection Audit was carried out by the Second Defendants which rated the vessel highly in all categories (save for one which was nonetheless adequate and irrelevant for present purposes). The Defendants will rely on the fact that the Vessel was at all material times in possession of Safety Management Certificate, the fact the same was issued only shortly before the incident and on the contents of the inspection and audit as evidence that the Vessel was in every material respect seaworthy and properly manned and equipped.

35. Without prejudice to the generality of the foregoing the Defendants respond to paragraph 12 below.

*(A) Supervision of sea fastening operations*

36. The general allegations made under this sub-section of paragraph 12 are denied. It is specifically denied that there was any need for a specific system for the supervision of sea fastening operations, whether as alleged or at all. The Defendants will further rely upon the matters set out at paragraphs 31(i)-(iv) above and will say that the hot work involved in removing the sea fastenings was inevitable because, without it, it would not have been possible to discharge the cargo.

*(B) Lack of Proper Hot Work procedures*

37. The general allegations made under this sub-section of paragraph 12 are denied. The Defendants will rely upon the matters set out at paragraphs 31(i)-(vi) above and upon the matters set out in the Vessel's SMS Manual.

*(C) Lack of proper $CO_2$ procedures*

38. The general allegations made under this sub-section of paragraph 12 are denied. The Defendants will rely upon the following facts and matters:

    (i)    the matters set out in the Vessel's SMS Manual and $CO_2$ Operations Manual to which reference is made at paragraph 31(vii) above;

    (ii)    the Master, Chief Officer, Second Officer, Third Officer, Bosun, one AB, the Chief Engineer, the Second Engineer, the Third Engineer and Electrician had all attended an Advanced Fire-Fighting training course;

    (iii)    there were regular fire drills held on board at regular intervals as required by SOLAS;

    (iv)    Upon joining the Vessel, each crew member underwent a period of familiarisation which included familiarisation with the location of the $CO_2$ room and the operation of the $CO_2$ system;

(v) A release plan was permanently located in the vessel's $CO_2$ room which gave concise instructions on the operation of the system and the correct number of cylinders to release.

*(D) Lack of proper Fire Safety procedures*

39. The general allegations made under this sub-section of paragraph 12 are denied. The Defendants will rely upon the matters set out in paragraph 31(i) to (ix) and subparagraph (C) above and the terms of the Vessels' SMS Manual and $CO_2$ Operations Manual.

40. Further and in any event it is denied that the matters alleged under sub-paragraph (xi) of this section evidence the absence of proper procedures or an absence of training in relation to such procedures.

*(E) Defective Hatch panel flaps*

41. The general allegations made under this sub-section of paragraph 12 are denied. The Defendants will rely upon the matters set out in paragraph 31(viii) to (ix) above and the terms of the Vessels' SMS Manual and $CO_2$ Operations Manual. In addition, the flaps were regularly maintained by the ship's crew.

42. Further and in any event it is denied that any of the matters alleged under paragraph 12 caused the fire or any of the losses claimed by Wellstream.

43. In the light of the above paragraph 13 is denied.

Brazilian Law

44. It is denied, as is alleged at paragraph 14 that the Defendants are liable to Wellstream for the damage to the cargo pursuant to any of the provisions of Brazilian law or the principles they reflect.

45. Subject to paragraph 42 above, and to the extent that the sub-paragraphs a to h of paragraph 14 are consistent with the texts of the provisions set out in Appendix 1 to this Defence and Counterclaim, the Defendants admit the provisions of Brazilian law set out under paragraph 14.

46. It is denied that Article 470 of the Commercial Code is relevant to the question of whether the Defendants are liable to Wellstream as alleged.

NORMAM

47. The Norm de Autorade Maritima ("NORMAM") is a body of regulations issued by the Brazilian Maritime Authorities, through the Directorate of Ports and Coasts. These

regulations are administrative rules and the breach of such regulations does not of itself give rise to civil liability. Chapter 11 of NORMAM relates to "Instructions, Training and Maintenance".

48. It is denied, as is alleged at paragraph 15 that the Defendants failed to comply with any of the provisions of NORMAM whether as alleged at paragraph 15 or at all.

49. Subject to paragraph 46 above and to the extent that the sub-paragraphs a to e of paragraph 15 are consistent with the texts of the provisions set out in Appendix 2 to this Defence and Counterclaim, the Defendants admit the provisions of NORMAM as set-out under paragraph 14.

50. It is not admitted that each and every requirement of Chapter 11 of NORMAM reflects good maritime practice and/or the minimum standards of due diligence as alleged at paragraph 16 are not admitted. As and when Wellstream set out in detail the precise breach(es) of NORMAM alleged to have been committed by the Defendants they will plead further to this paragraph.

51. As to paragraph 17:

    (i)    It is denied that either Defendant is or can be liable for the faults attributable to Ominato employees performing the unsecuring/unloading operation;

    (ii)    the matters alleged at paragraphs a to d of paragraph 17 are not admitted;

    (iii)    It is not admitted that, under Brazilian law, both the Owners and Mangers are responsible for any alleged faults of the Captain and/or crew.

<u>Damages</u>

52. It is denied that Wellstream have suffered any loss or damage by reason of any matters for which either of the Defendants is liable, whether such matters are referred to at paragraph 18 or at all.

53. Wellstream are put to proof of the following:

    (i)    the alleged losses set out at paragraph 18 and particularised in Annexure 2;

    (ii)    that each and every alleged head of loss was caused by matters for which either of the Defendants is liable;

14

       (iii)     each and every alleged head of loss is recoverable as a matter of Brazilian law.

54. In the premises, paragraph 19 is noted and paragraph 20 is denied.

55. Further, and in any event, if (which is denied) the Defendants are liable to Wellstream, pursuant to article 945 of the Brazilian Civil Code, their liability falls to be reduced by reason of the contributory negligence of Wellstream and/or those for whom Wellstream are vicariously liable pursuant to article 932 and/or 933 of the same Code, in respect of which the Defendants repeat the particulars set out above.

56. As to paragraph 21:

       (i)     it is admitted that in the event that the Defendants are found liable to pay damages to Wellstream there will arise in Brazilian law an entitlement to interest;

       (ii)     it is not admitted that, under Brazilian law, such interest is to be awarded at the rate of 1% per month (12% p.a.) on the basis of article 406 of the Civil Code and article 161 of the National Tax Code. Under Brazilian law it is open to a court to award interest at an appropriate rate such as the official rate SELIC applied to public debt bonds of the Brazilian Government.

57. Paragraph 22 is noted.

58. If, which is denied, the Defendants are liable to Wellstream whether as alleged or at all the Defendants will set off so much of their counterclaim as may be necessary in extinction or diminution of the claim.

---

## COUNTERCLAIM

---

59. The Defendants repeat paragraphs 1 to 58 of the Defence.

60. By reason of the matters pleaded in the Defence and in particular at paragraphs 30 and 32 thereof:

       (i)     the fire and consequent losses were caused by the fault/negligence/lack of skill and care of Ominato; and

(ii)     Wellstream are liable for all such losses to the Defendants.

61. The loss and damage sustained by the Defendants by reason of the fire for which Wellstream are liable are as follows:

(i)     the costs of the repairs to the Vessel and its structures as more fully set out at Appendix 3 to the Defence and Counterclaim;

(iii)    the losses arising out of the loss of use of the vessel whilst under repair as more fully set out at Appendix 3 hereto.

62. Further the Defendants claim interest, under Brazilian law, at the rate of 1% per month (12% p.a.) on the basis of Article 406 of the Civil Code and Article 161 of the National Tax Code, alternatively at the official rate SELIC applied to public debt bonds of the Brazilian Government.

63. Yet further the Defendants claim interest pursuant to section 35A of the Supreme Court Act 1981 on such sum at a rate and for a period to be assessed.

AND THE DEFENDANTS COUNTERCLAIM:

1. Damages;
2. Interest;
3. Costs;
4. Further or other relief.

SIMON CROALL QC
ROBERT THOMAS

Dated 30th May 2008

I believe that the facts stated in this Defence and Counterclaim are true. I confirm that I am authorised to sign this document on behalf of the Defendants.

Signed:  V E Sewell – Partner.
Bentleys, Stokes and Lowless

<u>2007 Folio 1301</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

B E T W E E N :-

(1) WELLSTREAM INTERNATIONAL LTD

(2) WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

<u>Claimants</u>

and

(1) ATLANT HEAVY LIFT CORPORATION LIMITED

(2) ATLANTSKA PLOVIDBA D.D.

<u>Defendant</u>

and

TRINITAS MARITIME CARRIERS BV

<u>Part 20 Defendant</u>

---

DEFENCE AND COUNTERCLAIM
OF THE DEFENDANTS

---

Bentleys, Stokes & Lowless
Solicitors
International House,
1 St Katharine's Way,
London E1W 1YL
Tel: +44 (0)20 7782 0990
Fax: +44 (0)20 7481 7978

IN THE HIGH COURT OF JUSTICE                    2007 Folio 1301
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
B E T W E E N:-


(1) WELLSTREAM INTERNATIONAL LTD
(2) WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

Claimants


and


(1) ATLANT HEAVY LIFT CORPORATION LIMITED
(2) ATLANTSKA PLOVIDBA D.D.

Defendants

and

TRINITAS MARITIME CARRIERS BV

Third Party

---

### APPENDIX 1 DEFENCE AND COUNTERCLAIM
### OF THE DEFENDANTS

---


"*Commercial Code, Article 519. The Master is considered actual depositary of the cargo and whatever goods he receives on board and as such he is obliged to care for their safekeeping, good stowage and preservation and their immediate delivery against production of the bills of lading (articles 586 and 587).*

*The Master's responsibility in respect of cargo starts since the moment he receives it and continues until its delivery in the place which was agreed or is in use at port of destination.*"


"*Commercial Code, Article 529. The Master is liable for all losses and damages which, due to his fault, omission or unskilfulness, affect the ship or cargo; without prejudice of criminal actions that his*

*embezzlement or wilful misconduct may give rise to.*

*The Master is also liable (civil liability) for thefts or any damages to the cargo items perpetrated on board by individuals of the crew, as long as these items are under his responsibility."*

*"Commercial Code, Article 494. All owners and co-parties are jointly and severally liable for the debts the Master gives rise to in order to fix, prepare and supply the ship; and this liability cannot be set aside by the allegation that the Master exceeded the limits of his powers or instructions if the creditors prove that the amount being claimed was employed to the benefit of the ship (art. 517). The same owners and co-parties are jointly and severally liable for the damages/losses that the Master causes to third parties by lack of diligence which he is obliged to exercise for the good custody, stowage and preservation of the goods received on board (article 519). This liability ceases to exist if those owners and co-parties abandon the ship and freights due and to become due in the respective voyage. It is not allowed the abandonment by the owner or co-party who at the same time is the Master of the ship."*

*"Civil Code, Article 927. He who, due to an unlawful act (articles 186 and 187), causes damage to another person, is liable to reparation."*

*"Art. 186. He who, due to voluntary action or omission, negligence or lack of prudence, violates rights and causes damage to another person, even if exclusively moral, commits unlawful act."*

*"Civil Code, Article 932. Are also liable in respect of civil compensation:*

*I – Parents, in respect of minor sons or daughters under their authority and company;*

*II – The tutor and the guardian, in respect of the persons they take care of, who are in the same condition as above;*

*III – The employer or principal in respect of their employees, servants or agents when performing the work they have been assigned or because of these;*

*IV – Owners of hotels, inns, houses or establishments where housing is provided for money, even for educational purposes, in respect of their guests, dwellers and students;*

*V – Persons who spontaneously have participated in the profits of crime"*

*"Civil Code, Article 942.The assets of the person liable for offending or violating another person's right is subject to the compensation of the damage caused; and if the offence has more than one perpetrator, all of them shall be jointly and severally liable for such reparation.*

*Sole paragraph – The co-perpetrators and the persons designated in article 932 are jointly and severally liable together with the perpetrator"*

*"Commercial Code, Article 565. Ship and freight are liable towards the cargo owners for damages sustained as a result of delicts, fault or culpable omission by the Master or people of the crew, committed in the service of the ship; the actions by the shipowners against the Master and by him against crewmembers being reserved.*

*The salary of the Master and the wages of the crew constitute special mortgage in these actions."*

*"Commercial Code, Article 470. In case of voluntary sale, the ownership of the vessel passes to buyers with all her encumbrances; being reserved the rights of privileged creditors that have tacit mortgage on her, which is:*

*(...)*

*9 – Cargo loss on delivery, insurance premiums on vessel or freight, and private averages, and everything in respect of the last voyage only."*

IN THE HIGH COURT OF JUSTICE                    2007 Folio 1301

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:-


(1)  WELLSTREAM INTERNATIONAL LTD

(2)  WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

Claimants


and


(1)  ATLANT HEAVY LIFT CORPORATION LIMITED

(2)  ATLANTSKA PLOVIDBA D.D.

Defendants

and

TRINITAS MARITIME CARRIERS BV

Third Party

---

**DEFENCE AND COUNTERCLAIM**
**OF THE DEFENDANTS**

**APPENDIX 2**

---

CHAPTER 11

INSTRUCTIONS , TRAINING AND MAINTENANCE
SECTION I
INSTRUCTIONS AND TRAINING

### 1101 - GENERALITIES

The vessels should be manned with personnel who are adequately capacitated to act promptly in emergency situations. There should be perfect familiarization between the man and the means, equipment, appliances and installations which can be used in emergency situations, principally when they result in the abandonment of the vessel.

These regulations are applicable to all vessels except for any dispositions to the contrary.

### 1102 - RULES AND TECHNICAL REQUIREMENTS

**a) General Emergency Alarm System**
The vessel should possess a system capable of making the general emergency alarm system sounds,so that it is heard in every habitable space and in those where the crew normally work.
**b) A Roster of Stations and Crewmember Obligations in Cases of Emergency**
1) The Rosters should specify the details in respect of the general emergency alarm system , as well as the actions to be taken by the crew and the passengers when the alarm sounds. The Rosters should also specify how the order to abandon ship will be given.
2) The Rosters should indicate the duties to be undertaken by the various members of the crew, including :
I) closing of the watertight doors and fire doors , valves , scupper holes , port holes , companion ways , dormer windows and other similar openings ;
II) vessel survival equipment and other life-saving equipment;
III) preparation and launching of the life boats ;
IV) general preparation of other life-saving equipment;
V) assembling the passengers ;
VI) using of communication equipment;
VII) making up fire fighting groups; and
VIII) special tasks in respect of the usage of equipment and fire fighting installations.

NORMAM 01/DPC/2005

3) The Rosters should specify which officers are designated to ensure that the life saving equipment and the fire fighting equipment are maintained in good conditions and ready for immediate use.

4) The Rosters should specify the substitutes of the key personnel that can possibly be injured, taking into consideration that different situations of emergency can require different measures.

5) The Rosters should indicate the duties to be carried out by the crewmembers in respect of the passengers in cases of emergencies. These should include:

I) advising the passengers;

II) verifying as to whether the passengers are using adequate clothing and have put on their life jackets correctly;

III) assemble the passengers at the assembly stations ; and

IV) maintain order in the corridors and on the stairs and general control of the passenger movement.

6) The Rosters should be prepared before the vessel sails.  After the Rosters are prepared, if there is any change in the crew which implies alteration of the rosters, the Captain of the vessel should alter same or prepare a new one.

7) The Rosters should be fixed in visible places through all the vessel , including on the bridge , the engine room and in the crew accomodation area.

## 1103 - TRAINING PROCEDURES AND DIVULGATION OF THE INSTRUCTIONS

a) Training

The training and instructions on board, on the use of life saving equipment, as well as equipment in the life boats, and the use of fire fighting equipment should be given as soon as possible, within a period of not more than two weeks after the embarkation of a crewmember.  However, if a crewmember is designated to a vessel, within a regular rotation program, this training should be given within a period of not more than two weeks after the first embarkation. The individual instruction can include different parts of the life saving equipment and fire fighting equipment on board, but all the equipment should be covered within a period of 2 months.

b)  Crew Proceedings

Each member of the crew should receive instructions which should include , but not necessarily be limited to :

1) Operation and use of inflatable life boats;

2)  correct first aid procedures , hypothermia problems and procedures in case of hypothermia;

3)  special instructions necessary for the use of life saving equipment on board in bad weather conditions; and

4)  operation and use of fire fighting equipment on board.

NORMAM 01/DPC/2005

c) Periodicity

The training on board in the use of life boats launched by a davit should be carried out in intervals of not more than three months, on every vessel which has such equipment. Always when possible, this should include the filling and the lowering of the life boats. This life boat can be a special life raft destined only for training and which is not part of the equipment on board. A life raft of this type should be clearly marked.

d) Instructions for Emergency Situations

All vessels should provide very clear instructions to every person on board which should be followed in emergency situations.

There should be illustrations and instructions fixed in visible places, in the passenger cabins and in the areas used by the passengers, indicating:

1) the life boat stations;

2) how they should act in emergency situations ; and

3) how to put on the life jacket;

e) Operation Instructions

Notices or signs, should be provided in the life boats or near them and in the commands to launch them , which should:

1) illustrate the reason for the controls and how to operate the device and contain instructions or pertinent warnings;

2) be easily visible in emergency lighting ; and

3) use symbols in conformity with the recommendations in Chapter 3 of these Regulations .

 f) Instruction Manual

The instruction manual, which can consist of various volumes, should contain instructions and information , written in simple terms and illustrated , whenever possible , in respect of the life saving equipment which can be found on board the vessel and on the best methods of survival. Part of this information can be supplied in the form of audio-visual aids, instead of manual. The manual should contain detailed information on the following points:

1) how to put on life jackets and immersion clothes , depending on the case;  ·

2) assemblies at the determined areas;

3) embarkation, launching and moving away from the vessel in the life boats;

4) method of launching , being inside the life boat;

5) uncoupling the launching devices ;

6) methods and uses of devices for protection in the launching areas whenever it is the case;

7) illumination in the launching area;

8) use of survival devices;

9) use of all the detection devices;

10) with the use of the illustration , use the radio part of the life saving equipment;

11) use of floating anchors;

12) use of motors and accessories;

13) recuperation of the survival boats and the life boats , including the stowing and lashing;

14) danger of exposure to bad weather;

15) best use possible of the means of survival existent on board the life boats;

NORMAN 01/DPC/2005

16) methods of recuperation , including the use of salvage material from helicopters , (sling ropes , baskets , litters) breeches buoy and salvage equipment on land and throwing heaving- line device of the vessel;

17) all the other functions mentioned in the Rosters and in the emergency instructions; and

18) instructions for emergency repairing of life saving equipment in cases of urgency;

An instruction manual should be available in all dining rooms and recreation rooms or in each crew cabin.

## 1107 – FIRE FIGHTING EXERCISES

### a) Exercise Program
Each exercise should include :

1) attendance at the posts and preparation for the duties described in the rosters;

2) start a fire pump and use, a minimum of, two jets of water necessary to show that the system is in good working order;

3) verification of fire fighting equipment and other personal life saving equipment;

4) verification of the pertinent communication system;

5) verification of the watertight doors , fire doors and cut fire "flaps" ; and

6) verification of the necessary arrangements for the subsequent abandonment of the vessel.

### b) Periodicity
The fire exercises should be planned in such a way that so that proper attention to the regular practicing off the different emergencies which can occur be carried out , depending on the type of vessel and its cargo. The periodicity should not be inferior to one month.

### c) Equipment Maintenance
The equipment used during the exercises should be immediately restored to its total operational condition. Any faults or defects found during the exercises should be corrected as soon as possible.

### d) Simulation
The exercises should, as much as possible , be conducted as if a real emergency were occurring.

NORMAN 01/DPC/2005

SECTION II

MAINTENANCE AND AVAILABILITY FOR OPERATION

1109 -- GENERALITIES

The materials and the equipment which make up the safety and Salvage equipment of the vessels should always be in useable conditions.
For this to be possible , the obligation of the crew to maintain operative the materials and equipment , so as to obtain the maximum fulfillment and efficiency in emergency situations.
These regulations are applicable to all vessels, except for any dispositions to the contrary.

IN THE HIGH COURT OF JUSTICE                    2007 Folio 1301
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
B E T W E E N:-

(1)  WELLSTREAM INTERNATIONAL LTD
(2)  WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

Claimants

and

(1)  ATLANT HEAVY LIFT CORPORATION LIMITED
(2)  ATLANTSKA PLOVIDBA D.D.

Defendants

and

TRINITAS MARITIME CARRIERS BV

Third Party

---

DEFENCE AND COUNTERCLAIM
OF THE DEFENDANTS

APPENDIX 3

---

## "ATLANT TRINA"
## Fire at Niteroi 25.08.06

### Claim Schedule

| Item No. | Description | US Dollars | Euros | Kn | Comments |
|---|---|---|---|---|---|
| A | Expenses at Niteroi | | | | |
| 1 | Disbursement Account - Niteroi | 86,014.47 | | | |
| 2 | Expenses of local adviser | 6,146.00 | | | |
| 3 | Marine Superintendent - Capt. N Bjelckasic | 17,873.38 | | | |
| 4 | Technical Superintendent - Mr R Benkovic | 15,512.60 | | | |
| 5 | Claims & Insurance Manager - Mr E Taslaman | 11,976.00 | | | |
| 6 | Vaccinations | | | 1,098.00 | |
| 7 | ICESL (Temporary repairs in Niteroi) | 25,640.00 | | | |
| 8 | EXTECIL (Fire Fighting/Safety Equipment) | 7,224.00 | | | |
| 9 | Brasimar Servicos Maritimos Lida (Fire -fighting) | 31,500.00 | | | |
| 10 | Astromaritima Navegacao SA ("ASTRO UBARANA" - Fire tug) | 58,000.00 | | | |
| 11 | Germanischer Lloyd (Niteroi) | | 6,266.80 | | |
| 12 | MacGregor (Service) | | 12,887.53 | | |
| 13 | Akti Marine Supply Service (Hatch cover packing) | 3,544.90 | | | |
| 14 | Lankhorst Touwfabriken BV (Mooring rope) | | 733.00 | | |
| 15 | Winteb (Air Pipe heads) | | 1,155.00 | | |
| | | 263,435.35 | 21,042.33 | 1,098.00 | |
| | | | | | |
| B | Bunkering at Las Palmas - 09.11.06 | | | | |
| 16 | Vapanas Suardiaz (Local Agent - Disbursements) | | 3,469.65 | | |
| | | | 3,469.65 | | |

# "ATLANT TRINA"
# Fire at Niteroi 25.08.06

## Claim Schedule

| Item No. | Description | US Dollars | Euros | Kn | Comments |
|---|---|---|---|---|---|
| C | | | | | |
|  | Crane Repairs at Hamburg (December 2006) | | | | |
| 17 | Germanischer Lloyd (Hamburg) | | 1,406.00 | | |
| 18 | NMF (Cranes - Inspection and repairs) | | 429,102.50 | | |
| 19 | Technical Superintendent - Mr R Benkovic | 1,970.10 | | | |
| 20 | Disbursements at Hamburg | 37,724.72 | | | |
| 21 | MacGregor Croatia  (Hatch Cover Paris sent to Hamburg) | | | 84,639.20 | |
|  | | 39,694.82 | 430,508.50 | 84,639.20 | |
|  | | | | | |
| D | | | | | |
|  | Hatch Cover Repairs at Gdansk ( Dec 2006/Jan 2007) | | | | |
| 22 | Germanischer Lloyd | | | 2,340.00 | |
| 23 | MacGregor Finland  (Replacement Hatch Cover Panels) | | 621,150.00 | | |
| 24 | Remontowa (Permanent Repairs) | 29,859.00 | | | |
| 25 | Burger Poland Sp. (Local Agent - Disbursements) | | 8,930.22 | | |
| 26 | Technical Superintendent - Mr N Napica | 3,532.98 | | | |
|  | | 33,391.98 | 630,080.22 | 2,340.00 | |
|  | | | | | |
| E | | | | | |
|  | Crane Service at Aviles (02.02.07) | | | | |
| 27 | NMF (Crane service) | | 3,599.00 | | |
| 28 | Technical Superintendent - Mr W Vergien | | 629.37 | | |
|  | | | 4,228.37 | | |
|  | | | | | |
| F | | | | | |
|  | Delivery of Crane Spares at Venice (February 2007) | | | | |
| 29 | NMF - Crane Spares | | 10,927.00 | | |
| 30 | NMF - Crane Engineer | | 629.31 | | |
| 31 | Agencia Miriucci (Local Agent - Disbursements) | 644.51 | | | |
|  | | 644.51 | 12,100.82 | | |

## "ATLANT TRINA"
## Fire at Niteroi 25.08.06

## Claim Schedule

| Item No. | Description | US Dollars | Euros | Kn | Comments |
|---|---|---|---|---|---|
| G | | | | | |
| 32 | Miscellaneous Owners' expenses | 74,498.77 | | | |
| 33 | Owners/Managers' expenses | 28,590.28 | | | |
| 34 | Lub oil usage | | | | |
| 35 | Crew Wages | 208,037.32 | | | |
| 36 | Bunkers consumed during off-hire period: | | | | |
| | HFO | 117,153.55 | | | |
| 37 | MDO | 31,423.35 | | | |
| 38 | MDO – Deduction for Owners' repairs in Gdansk | -6,934.15 | | | |
| | | 502,714.12 | | | |
| H | | | | | |
| | Off-Hire: | | | | |
| | Loss of Hire: | | | | |
| 39 | 26 August 2005 at 22:45 GMT to 14 January 2006 at 08:40 GMT | | 989,892.35 | | |
| | Deduction for Owner's repairs in Gdansk: | | -160,313.45 | | |
| | 22,90277 days | | 829,578.90 | | |
| | | | | | |
| | Totals | US$ | Euro | Kn | |
| | A | 265,455.55 | 21,042.33 | 1,098.00 | |
| | B | | 3,469.65 | | |
| | C | 39,694.82 | 430,508.50 | 84,689.20 | |
| | D | 33,391.98 | 630,080.22 | 2,340.00 | |
| | E | | 4,228.37 | | |
| | F | | 12,100.62 | | |
| | G | | 829,578.90 | | |
| | H | 502,714.12 | | | |
| | | 839,236.27 | 1,931,008.79 | 88,077.20 | |
| | Plus Agency at 1% | | | | |
| | Plus Interest | | | | |

# Ex. D

**Claim Form**
**(Additional claims –**
**CPR Part 20)**

| In the | High Court of Justice |
|---|---|
| | Queen's Bench Division |
| | Commercial Court |
| | Royal Courts of Justice |

|  | for court use only |
|---|---|
| Claim No. | 2007 Folio 761 |
| Issue date | 3 0 – 5 – 08 |

Claimant(s)

(1) Wellstream International Ltd of Wellstream House, Wincomblee Road, Walker Riverside, Newcastle Upon Tyne, NE6 3PF

(2) Wellstream Do Brasil Industria e Servicios Ltda. of Av. Rio Branco 138, 11A Andar, Rio de Janeiro 20040-002, Brazil



Defendant(s)

(1) Atlant Heavy Lift Corp. Ltd of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands

(2) Atlantska Plovidba D.D. of Old Svetog Mihajla 1, PO Box 192, Dubrovnik 20000, Croatia

Part 20 Claimant(s)

(1) Atlant Heavy Lift Corp. Ltd of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands

(2) Atlantska Plovidba D.D. of Od Svetog Mihajla 1, PO Box 192, Dubrovnik 20000, Croatia

Part 20 Defendant(s)

Trinitas Maritime Carriers BV of Bergweg 151, 3707 AC ZEIST, The Netherlands

Name and address of Part 20 Defendant receiving this claim form

Trinitas Maritime Carriers BV
Bergweg 151,
3707 AC ZEIST,
The Netherlands

| Amount claimed | To be assessed |
|---|---|
| Court fee | £1,530.00 |
| Solicitor's costs | To be assessed |
| Total amount | To be assessed |

The court office at the Admiralty and Commercial Registry, Royal Courts of Justice, Strand, London, WC2A 2LL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N211(CC) Claim form (CPR Part 7) (03.02)

| Brief details of claim | Claim No. | 2007 Folio 761 |
| --- | --- | --- |

See attached Defendants' Additional Claim Against Third Party.

I state that the High Court of England & Wales has power under the Council Regulation (EC) No. 44/2001 of 22 December 2000 (on jurisdiction and the recognition and enforcement of judgements in civil and commercial matters) to hear this claim and that no proceedings are pending between the parties in Scotland, Northern Ireland or any other Regulation State as defined by section 1 (3) of the Civil Jurisdiction and Judgments Act 1982.

Note: Particulars of Claim must be attached

**Statement of Truth**

*(I believe)(~~The Part 20 Claimant believes~~) that the facts stated in this claim form and the particulars of claim attached to this claim form are true.

*I am duly authorised by the Part 20 claimant to sign this statement

Full Name    VERNON EDWARD SEWELL

Name of *(Part 20 claimant)('s solicitor's firm)    BENTLEYS STOKES & LOWLESS

signed                                position or office held    PARTNER

*(Part 20 Claimant)('s solicitor)    (if signing on behalf of firm, company or corporation)
* delete as appropriate

Bentleys, Stokes & Lowless
International House
1 St. Katharine's Way
London E1W 1YL

Ref: VES/PMG/SLA/U00012.50
Fax: +44 (0)20 7481 7978

*Part 20 Claimant's or solicitor's address to which documents or payments should be sent if different from overleaf. If you are prepared to accept service by DX, fax or email, please include details.

IN THE HIGH COURT OF JUSTICE                    2007 Folio 1301
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
B E T W E E N :-


(1)  WELLSTREAM INTERNATIONAL LTD
(2)  WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

Claimants

and


(1)  ATLANT HEAVY LIFT CORPORATION LIMITED
(2)  ATLANTSKA PLOVIDBA D.D.

Defendants

and


TRINITAS MARITIME CARRIERS BV

Third Party

---

**PARTICULARS OF THE DEFENDANTS' CLAIMS
AGAINST THE THIRD PARTY**

---

**Introduction**

1.  This is an additional claim made by the Defendants against the Third Party, Trinitas
    Maritime Carriers BV ("Trinitas"), pursuant to CPR Part 20.7.

2.  In this action, the Claimants claim damages from the Defendants in respect of alleged
    damage to a cargo of reels and associated equipment arising out of a fire which broke out
    on the Defendants' vessel M/V ATLANT TRINA ("the Vessel") during discharging
    operations at Niteroi, Brazil, on or about 25 August 2006.

3.  As set out in the Particulars of Claim served herewith, the Claimants allege that the
    damage to the cargo was caused by, amongst other things, the negligence of those
    discharging the cargo and/or the Master and/or crew and that the Defendants are
    therefore liable to the Claimants for the consequent loss and damage as a matter of
    Brazilian law, which (as set out at paragraph 3 of the Particulars of Claim) the Claimants
    and the Defendants have expressly agreed is the applicable law for determining their
    respective rights and liabilities in these proceedings.

11. By a Contract of Affreightment between Trinitas as carriers and the First Claimants as shippers, entered into on or about 14 July 2005 ("the Trinitas COA"), contained in or evidenced by a document entitled "Additional Clauses to Carriers' Bill of Lading Form" which was signed on behalf of both parties, it was agreed that all shipments of Wellstream's reels and associated equipment from Newcastle Upon Tyne to Brazil would be carried by Trinitas upon the terms set out in that document.

12.    The terms of the Trinitas COA included, amongst others, the following:

> *"20- Obligations of the parties*
> *During the term of this agreement the fundamental principles upon which this commercial arrangement is founded are outlined below:*
> *(i)    Wellstream shall exclusively utilise the services of Trinitas for all of its reel shipments between Newcastle and Brazil...*
>
> *21 – Shipping Terms*
> *...*
> *Free out and in unstowed, un-lashing, un-securing, un-dunnaging at Brazilian port.*
>
> *23 – Seafastening*
> *...*
> *At Carrier's account, Carrier to accomplish actual sea fastening in accordance with approved plan and removal of sea fastening at discharge port.*

13. On or about 9 August 2006, the cargo of reels and associated equipment to which this claim relates was shipped in good condition on board the Vessel at Newcastle upon Tyne for carriage to Niterol in Brazil. The cargo comprised:

(i)    17 reels of pipe for the sub-sea oil industry which had been manufactured to fulfil the requirements of a contract between Wellstream and Petrobras, the Brazilian national oil company. The pipe was a composite material designed for high-pressure sub-sea applications. The inner pipe was a flexible stainless steel pipe and there were various layers covering the inner pipe many of which were made of different types of plastic. For storage and carriage purposes the pipe was coiled onto steel reels. The reels were about 8.5 m in diameter and a little over 6 m wide.

(ii)    11 wooden crates said to contain 10 Trunion Rollers and 2 Motors 750 Spray Nozzles.

(iii)    10 boxes said to contain Oil export flexible raiser and flowline bend stiffener.

14. Shipment of the Cargo in apparent good order and condition was evidenced by three bills of lading dated 9 August 2006 issued by and/or on behalf of Trinitas ("the Bills of Lading"). The Bills of Lading named Wellstream as shippers and consignees.

3

15. Five of the reels shipped under the Bills of Lading were stowed on deck and the balance of the Cargo was stowed under deck. The reels which were stowed on deck were secured to the deck in the following manner:

    (i)    20 mm thick steel plates were placed on edge and each was welded to both the foot of the reel and the deck ("the sea fastenings"). There were five sea fastenings on each foot (each reel consisting of two feet) usually arranged three on the outside face of the foot and two on the inside face. The sea fastenings were designed by Marine Heavy Lift Partners BV at the request of Trinitas.

    (ii)    At either end of each foot were steel structures constructed from 20 mm thick steel ("the end stops"). The end stops were welded to the deck, but not to the foot of the reel and were designed to provide fore and aft restraint. These were also designed by Marine Heavy Lift Partners BV at the request of Trinitas.

    (iii)    In addition, extra chain lashings were supplied to those reels stowed on deck and the two forward in the hold.

**The Voyage**

16. The crossing from Newcastle upon Tyne to Niteroi took 15 days and was without incident.

17. Prior to the Vessel's arrival at Niteroi, Trinitas engaged Ominato Servicos e Construcoes Ltda ("Ominato") to carry out hot works at Niteroi on behalf of themselves and Wellstream in order to remove the sea fastenings.

18. The Vessel arrived off Niteroi on 25 August 2006 at about 05:50 hours local time. The pilot boarded at about 13:35 hours and brought the Vessel into port, bringing her alongside at about 15:00 hours.

**Events at Niteroi**

19. Ominato brought about 12 men on board the vessel. Four or five were to be engaged in oxy-acetylene cutting operations, three were to use grinders and the remainder provided assistance and support. These men included their Managing Partner, a Mr Bussolotti.

20. The proposed removal of the sea fastenings was discussed by the Chief Officer with Mr Schreiter (the Supercargo) and Mr Bussolotti. It was agreed that the following procedure would be followed:

    (i)    Ominato's employees were to make a first cut to 2/3cm above the deck before discharge to permit removal of the reels;

(ii) Then, after the reel had been discharged a second cut was to be made to a height sufficiently away from the deck/hatch covers to prevent the risk of damage. A distance of approximately 10mm above the deck was agreed. The cutting was to be done in such a way as to avoid damage to the Vessel;

(iii) Thereafter, the remaining parts of the sea fastenings and end stops would be removed by grinding.

21. A Hot Work Permit was completed and counter-signed on behalf of Ominato by Mr Bussolotti.

22. Hot works commenced shortly after about 18:30 hours. Work commenced upon the reels on deck from the aft of the Vessel moving forwards.

23. At about 1925 hours the aftmost reel (No. WS-129) was unsecured and discharged from the Vessel using the shore crane provided by the terminal.

24. Shortly thereafter the Ominato employees returned to cut down the sea fastenings and end stops for that reel. Whilst cutting away the forward inboard end stop an operator allowed the flame of the oxy-acetylene torch to penetrate the surface of the hatch cover of the vessel and burn a small hole through the plating in the vicinity of frame 78.

25. As a result of the hole being burned in the hatch cover, molten metal and/or sparks fell into the hold. The material first ignited was the tarpaulin used to protect the outer layer of pipe on the reel WNC-23, which was stowed in the hold below the starboard side of hatch cover 5.

26. At some time between 19:35 and 19:45 hours the alarm sounded and indicated that there was smoke in the hold.

27. The Ominato employees left the Vessel immediately after the sounding of the alarm leaving their cutting gear, grinding equipment and other equipment on deck. Some of the abandoned torches were left in the open position.

28. The crew, however, initiated fire fighting and shortly before 21:00 hours 26 bottles of $CO_2$ were released into the hold, successfully extinguishing the fire in the hold.

29. In the meantime, however, the fire on deck developed rapidly. Flames started at the base of reel WS-105 close to the deck and quickly spread up and round the reel.

30. The Fire Brigade arrived at about 21:00 hours. At about 21:30 hours, two harbour tugs arrived alongside followed shortly by a third. These vessels were equipped with fire fighting monitors and joined the fire fighting. Water was directed onto the reels forward of the burning reel in an attempt to prevent fire spread to these. This was not successful and the material on reel WNC-64, adjacent to WS-105, ignited.

31. At about 23:00 hours an offshore supply vessel, M/V ASTRO UBARANA came alongside, the other tugs withdrew and ASTRO UBARANA took over fire fighting operations. This vessel was equipped with two powerful fire monitors.

32. During the morning of 26 August 2006 the intensity of the fire diminished. At about 16:45 hours a floating crane in the harbour was brought alongside and at about 18:20 hours reel WS-105 was lifted over the port bulwark and immersed in the sea to extinguish the fire. The fire burning on reel WNC-64 was less intense than it had been and by about 20:00 hours the fire in reel WNC-64 appeared to be extinguished.

33. During the course of the fire fighting by the tugs and M/V ASTRO UBARANA damage was caused to the Vessel, her cranes and the shore crane.

**Ominato's Unlawful Acts**

34. The sole and effective cause of the fire and the consequent loss and damage suffered by the Claimants and the Defendants was the negligence and/or lack of skill and care and/or lack of prudence on the part of Ominato and/or its employees while they were carrying out the hot work described above. In particular, they:

    (i)    Failed to carry out the hot work with any or any sufficient care and/or skill and/or prudence;

    (ii)    Failed to carry out the hot work in accordance with the agreed procedure set out at paragraph 20 above;

    (iii)    Allowed the flames of the oxy-acetylene torches to penetrate the surface of the hatch cover of the Vessel and burn a hole through the plating in the vicinity of frame 78;

    (iv)    Failed to prevent the flames of the oxy-acetylene torches from penetrating the surface of the hatch cover of the Vessel and burning a hole through the plating in the vicinity of frame 78;

6

(v)    Caused or allowed molten metal and/or sparks to fall into the hold;

(vi)    Failed to exercise any or any proper supervision of the aforesaid hot work.

35. Further and alternatively, any and all further particulars of negligence and/or lack of skill and care and/or lack of prudence in the performance of the hot work which may be made against Ominato by the Claimants (whether expressly or by implication) are and/or will be adopted by the Defendants against Trinitas with logical alterations and amendments.

36. In the circumstances, Ominato and/or its employees committed unlawful acts within the meaning of Article 186 of the Brazilian Civil Code, which provides as follows:

> "He who, due to voluntary act or omission, negligence or lack of prudence, violates rights and causes damage to another person ... commits unlawful act".

**Liability of Trinitas for Ominato's Unlawful Acts**

**Strict Liability**

37. Article 932 of the Brazilian Civil Code provides that the following (amongst others) are liable for the acts of others:

> "...
> III – The employer or principal in respect of their employees, servants or agents when performing the work they have been assigned or because of these; ..."

38. Article 933 of the Brazilian Civil Code further provides as follows:

> "The person designated in Items I to IV of the preceding Article, even if there is no fault on their part, shall be liable for the acts committed by the third parties referred to therein."

39. Trinitas are strictly liable for the unlawful acts committed by Ominato and/or its employees while they were performing the hot work described above by reason of the fact that they engaged Ominato who were acting for their account and upon their instructions.

*Culpa in Eligendo and Culpa in Vigilando*

40. Insofar as it is necessary, the Defendants will also contend that Trinitas are liable to the Defendants because of their failure to appoint sufficiently competent and/or skilled agents and their failure to supervise the work of Ominato. The Defendants rely on the Brazilian doctrines of *culpa in eligendo* and *culpa in vigilando*, pursuant to which the employer or principal is presumed to be liable for the unlawful acts of third parties under their control and authority.

7

41. Further and in any event, Trinitas themselves were at fault ("*culpa*") in appointing Ominato to carry out the hot work and in their supervision of the Ominato employees. In particular they:

    (i)    Failed to make any or any proper enquiries as to the qualifications and/or experience and/or skill of the Ominato employees both generally and with specific regard to cutting and/or hot work before appointing them to discharge the cargo at Niteroi;

    (ii)    Failed to ensure that the Ominato employees were carrying out the cutting and/or hot work with any or any sufficient skill and/or care and/or prudence;

    (iii)    Failed to ensure that the Ominato employees were carrying out the cutting and/or hot work in accordance with the agreed instructions referred to at paragraph 20 above;

    (iv)    Failed to ensure that the Ominato employees did not allow the flames of the oxy-acetylene torches to penetrate the surface of the hatch cover of the Vessel and burn a hole through the plating in the vicinity of frame 78;

    (v)    Failed to ensure that the Ominato employees did not cause or allow molten metal and/or sparks to fall into the hold.

42. Further and alternatively, any and all further particulars of negligence and/or lack of skill and care and/or lack of prudence relating to the appointment of Ominato and supervision of the Ominato employees made against Ominato by the Claimants (whether expressly or by implication) are and/or will be adopted by the Defendants against Trinitas with logical alterations and amendments.

### Relief

43. As a result of the matters aforesaid, the Defendants have suffered loss and damage for which Trinitas is liable, and, in particular:

    (i)    Their liability (if any) to the Claimants;

    (ii)    The costs of the repairs to the Vessel and its structures;

    (iii)    The losses arising out of the loss of use of the Vessel whilst under repair;

    (iv)    Any liability the Defendants may incur to the terminal at Niteroi for damage to the shore crane.

44. Particulars of the aforesaid loss and damage sustained by the Defendants as a result of the fire are set out in Appendix 3 to the Defence and Counterclaim.

**The Civil Liability (Contribution) Act 1978**

45. Further or alternatively, if contrary to their Defence, the Defendants are found liable to the Claimants, the Defendants claim an indemnity, alternatively a contribution from Trinitas pursuant to the Civil Liability (Contribution) Act 1978, on the basis that Trinitas are liable to Wellstream for the damage claimed by Wellstream in the Particulars of Claim. The Defendants will rely upon the matters set out above and in particular those set out at paragraphs 34-42 above in support of this claim.

46. Further the Defendants claim interest, under Brazilian law, at the rate of 1% per month (12% p.a.) on the basis of Article 406 of the Civil Code and Article 161 of the National Tax Code, alternatively at the official rate SELIC applied to public debt bonds of Brazilian Government.

47. Yet further the Defendants claim interest pursuant to section 35A of the Supreme Court Act 1981 on such sum at a rate and for a period to be assessed.

AND THE DEFENDANTS CLAIM:

1. Damages and/or an indemnity and/or contribution;
2. Interest;
3. Costs;
4. Further or other relief.

SIMON CROALL QC

ROBERT THOMAS

Dated 30th May 2008

I believe that the facts stated in this Particulars of the Defendants' Claims against the Third Party are true. I confirm that I am authorised to sign this document on behalf of the Defendants.

................................................

Signed:  V E Sewell – Partner.

Bentleys, Stokes and Lowless

9

<u>2007 Folio 1301</u>

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

B E T W E E N :-

(1) WELLSTREAM INTERNATIONAL LTD

(2)WELLSTREAM DO BRASIL INDUSTRIA E SEVICOS LTDA

<u>Claimants</u>

and

(1) ATLANT HEAVY LIFT CORPORATION LIMITED

(2) ATLANTSKA PLOVIDBA D.D.

<u>Defendants</u>

and

TRINITAS MARITIME CARRIERS BV

<u>Third Party</u>

---

PARTICULARS OF THE DEFENDANTS' CLAIMS
AGAINST THE THIRD PARTY

---

Bentleys Stokes & Lowless

International House

1 St Katherine's Way

London

E 1W 1YL